Alice **CHILDRESS**, Plaintiff–Appellee,

v.

Clarice **TAYLOR**, Paul B. Berkowsky, the Moms Company, and Ben Caldwell, Defendants–Appellants.

No. 1764, Docket 91–7309.

United States Court of Appeals, Second Circuit.

Argued July 8, 1991.

Decided Sept. 18, 1991.

Peter Herbert, New York City (Baila H. Celedonia, Richard S. Mandel, Alasdair J. McMullan, Cowan, Liebowitz & Latman, New York City, on the brief), for defendants-appellants.

David Blasband, New York City (Nancy F. Wechsler, Jessica R. Friedman, Deutsch Klagsbrun & Blasband, on the brief), for plaintiff-appellee.

Before MESKILL, NEWMAN, and PRATT, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal requires consideration of the standards for determining when a contributor to a copyrighted work is entitled to be regarded as a joint author. The work in question is a play about the legendary Black comedienne Jackie "Moms" Mabley. The plaintiff-appellee Alice Childress claims to be the sole author of the play. Her claim is disputed by defendant-appellant

Clarice Taylor, who asserts that she is a joint author of the play. Taylor, Paul B. Berkowsky, Ben Caldwell, and the "Moms" Company appeal from the February 21, 1991, judgment of the District Court for the Southern District of New York (Charles S. Haight, Jr., Judge) determining, on motion for summary judgment, that Childress is the sole author. We affirm.

### Facts

Defendant Clarice Taylor has been an actress for over forty years, performing on stage, radio, television, and in film. After portraying "Moms" Mabley in a skit in an off-off-Broadway production ten years ago, Taylor became interested in developing a play based on Mabley's life. Taylor began to assemble material about "Moms" Mabley, interviewing her friends and family, collecting her jokes, and reviewing library resources.

In 1985, Taylor contacted the plaintiff, playwright Alice Childress, about writing a play based on "Moms" Mabley. Childress had written many plays, for one of which she won an "Obie" award. Taylor had known Childress since the 1940s when they were both associated with the American Negro Theatre in Harlem and had previously acted in a number of Childress's plays.

When Taylor first mentioned the "Moms" Mabley project to Childress in 1985, Childress stated she was not interested in writing the script because she was too occupied with other works. However, when Taylor approached Childress again in 1986, Childress agreed, though she was reluctant due to the time constraints involved. Taylor had interested the Green Plays Theatre in producing the as yet unwritten play, but the theatre had only one slot left on its summer 1986 schedule, and in order to use that slot, the play had to be written in six weeks.

Taylor turned over all of her research material to Childress, and later did further research at Childress's request. It is undisputed that Childress wrote the play, entitled "Moms: A Praise Play for a Black Comedienne." However, Taylor, in addition to providing the research material, which according to her involved a process of sifting through facts and selecting pivotal and key elements to include in a play on "Moms" Mabley's life, also discussed with Childress the inclusion of certain general scenes and characters in the play. Additionally, Childress and Taylor spoke on a regular basis about the progress of the play.

Taylor identifies the following as her major contributions to the play: (1) she learned through interviews that "Moms" Mabley called all of her piano players "Luther," so Taylor suggested that the play include such a character; (2) Taylor and Childress together interviewed Carey Jordan, "Moms" Mabley's housekeeper, and upon leaving the interview they came to the conclusion that she would be a good character for the play, but Taylor could not recall whether she or Childress suggested it; (3) Taylor informed Childress that "Moms" Mabley made a weekly trip to Harlem to do ethnic food shopping; (4) Taylor suggested a street scene in Harlem with speakers because she recalled having seen or listened to such a scene many times; (5) the idea of using a minstrel scene came out of Taylor's research; (6) the idea of a card game scene also came out of Taylor's research, although Taylor could not recall who specifically suggested the scene; (7) some of the jokes used in the play came from Taylor's research; and (8) the characteristics of "Moms" Mabley's personality portrayed in the play emerged from Taylor's research. Essentially, Taylor contributed facts and details about "Moms" Mabley's life and discussed some of them with Childress. However, Childress was responsible for the actual structure of the play and the dialogue.

Childress completed the script within the six-week time frame. Childress filed for and received a copyright for the play in her name. Taylor produced the play at the Green Plays Theatre in Lexington, New York, during the 1986 summer season and played the title role. After the play's run at the Green Plays Theatre, Taylor planned a second production of the play at the Hudson Guild Theatre in New York City.

At the time Childress agreed to the project, she did not have any firm arrangements with Taylor, although Taylor had paid her $2,500 before the play was produced. On May 9, 1986, Taylor's agent, Scott Yoselow, wrote to Childress's agent, Flora Roberts, stating:

Per our telephone conversation, this letter will bring us up-to-date on the current status of our negotiation for the above mentioned project:

1. CLARICE TAYLOR will pay ALICE CHILDRESS for her playwriting services on the MOMS MABLEY PROJECT the sum of $5,000.00, which will also serve as an advance against any future royalties.

2. The finished play shall be equally owned and be the property of both CLARICE TAYLOR and ALICE CHILDRESS.

It is my understanding that Alice has commenced writing the project. I am awaiting a response from you regarding any additional points we have yet to discuss.

Flora Roberts responded to Yoselow in a letter dated June 16, 1986:

As per our recent telephone conversation, I have told Alice Childress that we are using your letter to me of May 9, 1986 as a partial memo preparatory to our future good faith negotiations for a contract. There are two points which I include herewith to complete your two points in the May 9th letter, i.e.:

1) The $5,000 advance against any future royalties being paid by Clarice Taylor to Alice Childress shall be paid as follows. Since $1,000 has already been paid, $1,500 upon your receipt of this letter and the final $2,500 to be paid upon submission of the First Draft, but in no event later than July 7, 1986.

2) It is to be understood that pending the proper warranty clauses to be in-

cluded in the contract, Miss Childress is claiming originality for her words only in said script.

After the Green Plays Theatre production, Taylor and Childress attempted to formalize their relationship. Draft contracts were exchanged between Taylor's attorney, Jay Kramer, and Childress's agent, Roberts. During this period, early 1987, the play was produced at the Hudson Guild Theatre with the consent of both Taylor and Childress. Childress filed for and received a copyright for the new material added to the play produced at the Hudson Guild Theatre.

In March 1987, Childress rejected the draft agreement proposed by Taylor,[1] and the parties' relationship deteriorated. Taylor decided to mount another production of the play without Childress. Taylor hired Ben Caldwell to write another play featuring "Moms" Mabley; Taylor gave Caldwell a copy of the Childress script and advised him of elements that should be changed.

The "Moms" Mabley play that Caldwell wrote was produced at the Astor Place Theatre in August 1987.[2] No reference to Childress was made with respect to this production. However, a casting notice in the trade paper "Back Stage" reported the production of Caldwell's play and noted that *it* had been "presented earlier this season under an Equity LOA at the Hudson Guild Theatre."

Flora Roberts contacted Jay Kramer to determine whether this notice was correct. Kramer responded:

Ben Caldwell has written the play which I will furnish to you when a final draft is available. We have tried in every way to distinguish the new version of the play from what was presented at the Hudson Guild, both by way of content and billing.

Undoubtedly, because of the prevalence of public domain material in both versions of the play, there may be un-

---

1. The preamble to this draft agreement stated:

   The Producer [Taylor] wishes to acquire from the Author [Childress] the rights to produce and present a dramatic play written by Author and heretofore presented at the Hudson

   Guild Theatre based on the life and career of Moms Mabley. . . .

2. The Caldwell play was billed as being "based on a concept by Clarice Taylor." Taylor was not listed as an author of that play.

avoidable similarities. Please also remember that Alice was paid by Clarice for rights to her material which we have never resolved.

Kramer never sent a copy of Caldwell's play. Childress's attorney, Alvin Deutsch, sent Kramer a letter advising him of Childress's rights in the play as produced at the Hudson Guild and of her concerns about the advertising connecting Caldwell's play to hers. For example, one advertisement for Caldwell's play at the Astor Place Theatre quoted reviews referring to Childress's play. Other advertisements made reference to the fact that the play had been performed earlier that season at the Hudson Guild Theatre.

Childress sued Taylor and other defendants alleging violations of the Copyright Act, 17 U.S.C. § 101 *et seq.* (1988), the Lanham Act, 15 U.S.C. §§ 1051, 1125(a) (1988), and New York's anti-dilution statute, N.Y. Gen.Bus.Law § 368-d (McKinney 1984). Taylor contended that she was a joint author with Childress, and therefore shared the rights to the play. Childress moved for summary judgment, which the District Court granted. The Court concluded that Taylor was not a joint author of Childress's play and that Caldwell's play was substantially similar to and infringed Childress's play. In rejecting Taylor's claim of joint authorship, Judge Haight ruled (a) that a work qualifies as a "joint work" under the definition section of the Copyright Act, 17 U.S.C. § 101, only when *both* authors intended, at the time the work was created, "that their contributions be merged into inseparable or interdependent parts of a unitary whole," *id.*, and (b) that there was insufficient evidence to permit a reasonable trier to find that Childress had the requisite intent. The Court further ruled that copyright law requires the contributions of both authors to be independently copyrightable, and that Taylor's contributions, which consisted of ideas and research, were not copyrightable.

## Discussion

In common with many issues arising in the domain of copyrights, the determination of whether to recognize joint authorship in a particular case requires a sensitive accommodation of competing demands advanced by at least two persons, both of whom have normally contributed in some way to the creation of a work of value. Care must be taken to ensure that true collaborators in the creative process are accorded the perquisites of co-authorship and to guard against the risk that a sole author is denied exclusive authorship status simply because another person rendered some form of assistance. Copyright law best serves the interests of creativity when it carefully draws the bounds of "joint authorship" so as to protect the legitimate claims of both sole authors and co-authors.

Co-authorship was well known to the common law. An early formulation, thought by Learned Hand to be the first definition of "joint authorship," *see Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 267 (2d Cir.1944) (*"Marks"*), is set out in *Levy v. Rutley*, L.R., 6 C.P. 523, 529 (Keating, J.) (1871): "a joint laboring in furtherance of a common design." Judge Hand endorsed that formulation in the District Court, concluding that the book for the comic opera "Sweethearts" was a work of joint authorship. *Maurel v. Smith*, 220 F. 195 (S.D.N.Y.1915), *aff'd*, 271 F. 211 (2d Cir. 1921). Three decades later, he adopted the formulation for this Circuit in *Marks*, determining that the words and music of a song ("December and May") formed a work of joint authorship even though the lyricist wrote the words before he knew the identity of the composer who would later write the music.

Like many brief formulations, the language from *Levy v. Rutley* is useful in pointing an inquiry in the proper direction but does not provide much guidance in deciding the close cases. Many people can be said to "jointly labor" toward "a common design" who could not plausibly be considered co-authors. And beyond the fairly straightforward context of words and music combined into a song, whatever formulation is selected will not necessarily fit neatly around such varied fact situa-

tions as those concerning architectural plans, *see Meltzer v. Zoller*, 520 F.Supp. 847 (D.N.J.1981), or computer programs, *see Ashton–Tate Corp. v. Ross*, 728 F.Supp. 597 (N.D.Cal.1989), *aff'd*, 916 F.2d 516 (2d Cir.1990). Though the early case law is illuminating, our task is to apply the standards of the Copyright Act of 1976 and endeavor to achieve the results that Congress likely intended.

■ The Copyright Act defines a "joint work" as

> a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

17 U.S.C. § 101. As Professor Nimmer has pointed out, this definition is really the definition of a work of joint authorship. *See* 1 *Nimmer on Copyright* § 6.01 (1991). The definition concerns the *creation* of the work by the joint authors, not the circumstances, in addition to joint authorship, under which a work may be *jointly owned*, for example, by assignment of an undivided interest. The distinction affects the rights that are acquired. Joint authors hold undivided interests in a work, like all joint owners of a work, but joint authors, unlike other joint owners, also enjoy all the rights of authorship, including the renewal rights applicable to works in which a statutory copyright subsisted prior to January 1, 1978. *See* 17 U.S.C. § 304.

Some aspects of the statutory definition of joint authorship are fairly straightforward. Parts of a unitary whole are "inseparable" when they have little or no independent meaning standing alone. That would often be true of a work of written text, such as the play that is the subject of the pending litigation. By contrast, parts of a unitary whole are "interdependent" when they have some meaning standing alone but achieve their primary significance because of their combined effect, as in the case of the words and music of a song. Indeed, a novel and a song are among the examples offered by the legislative committee reports on the 1976 Copyright Act to illustrate the difference between "inseparable" and "interdependent" parts. *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 120 (1976) (*"House Report"*), reprinted in 1976 U.S.C.C.A.N. 5659, 5736; S.Rep. No. 473, 94th Cong., 2d Sess. 103–04 (1975) (*"Senate Report"*).[3]

The legislative history also clarifies other aspects of the statutory definition, but leaves some matters in doubt. Endeavoring to flesh out the definition, the committee reports state:

> [A] work is "joint" if the authors collaborated with each other, or if *each* of the authors prepared his or her contribution with the knowledge and *intention* that it would be merged with the contributions of other authors as "inseparable or interdependent parts of a unitary whole." The touchstone here is the *intention, at the time the writing is done*, that the parts be absorbed or combined into an integrated unit. . . .

*House Report* at 120; *Senate Report* at 103 (emphasis added). This passage appears to state two alternative criteria—one focusing on the act of collaboration and the other on the parties' intent. However, it is hard to imagine activity that would constitute meaningful "collaboration" unaccompanied by the requisite intent on the part of both participants that their contributions be merged into a unitary whole, and the case law has read the statutory language

---

**3.** Professor Nimmer suggests that the distinction is analogous to the distinction between derivative and collective works, with parts said to be "inseparable" if the contribution of a second author "recast[s], transform[s] or adapt[s]" the contribution of a first author, and said to be "interdependent" if the contributions of each author are assembled, without recasting, into a collective whole. *See* 1 *Nimmer on Copyright* § 6.04 at 6–11; *M.G.B. Homes, Inc. v. Ameron Hoes, Inc.*, 903 F.2d 1486, 1493 (11th Cir.1990). The analogy is inexact at best since the elements of a collective work normally have considerable significance as independent parts; each play in an anthology remains a significant creation even though the selection of plays entitles the anthology to a copyright, and the selection of items to be combined, which produces the copyrightable ingredient of the collective work, normally adds far less significance to the constituent parts than the enhanced effect resulting from the combination of the words and music of a song in a work of joint authorship.

literally so that the intent requirement applies to all works of joint authorship. *See, e.g., Weissmann v. Freeman,* 868 F.2d 1313, 1317–19 (2d Cir.1989); *Eckert v. Hurley Chicago Co., Inc.,* 638 F.Supp. 699, 702–03 (N.D.Ill.1986).

■ A more substantial issue arising under the statutory definition of "joint work" is whether the contribution of each joint author must be copyrightable or only the combined result of their joint efforts must be copyrightable. The Nimmer treatise argues against a requirement of copyrightability of each author's contribution, *see* 1 *Nimmer on Copyright* § 6.07; Professor Goldstein takes the contrary view, *see* 1 Paul Goldstein, *Copyright: Principles, Law and Practice* § 4.2.1.2 (1989), with the apparent agreement of the Latman treatise, *see* William F. Patry, *Latman's The Copyright Law* 116 (6th ed. 1986) (hereinafter *"Latman"*). The case law supports a requirement of copyrightability of each contribution. *See M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1493 (11th Cir.1990); *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1087 (9th Cir.1989); *Ashton–Tate Corp. v. Ross,* 728 F.Supp. at 601; *Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.,* 609 F.Supp. 1307, 1318–19 (E.D.Pa.1985), *aff'd without consideration of this point,* 797 F.2d 1222 (3d Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987); *Kenbrooke Fabrics Inc. v. Material Things,* 223 U.S.P.Q. 1039, 1044–45, 1984 WL 532 (S.D.N.Y.1984); *Meltzer v. Zoller,* 520 F.Supp. 847, 857 (D.N.J.1981); *Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Construction Co.,* 542 F.Supp. 252, 259 (D.Neb.1982).[4] The Register of Copyrights strongly supports this view, arguing that it is required by the statutory standard of "authorship" and perhaps by the Constitu-

tion. *See Moral Rights in Our Copyright Laws: Hearings on S. 1198 and S. 1253 Before the Subcomm. on Patents, Copyrights and Trademarks of the Senate Comm. on the Judiciary,* 101st Cong., 1st Sess. 210–11 (1989) (statement of Ralph Oman).

The issue, apparently open in this Circuit, is troublesome. If the focus is solely on the objective of copyright law to encourage the production of creative works, it is difficult to see why the contributions of all joint authors need be copyrightable. An individual creates a copyrightable work by combining a non-copyrightable idea with a copyrightable form of expression; the resulting work is no less a valuable result of the creative process simply because the idea and the expression came from two different individuals. Indeed, it is not unimaginable that there exists a skilled writer who might never have produced a significant work until some other person supplied the idea. The textual argument from the statute is not convincing. The Act surely does not say that each contribution to a joint work must be copyrightable, and the specification that there be "authors" does not necessarily require a copyrightable contribution. "Author" is not defined in the Act and appears to be used only in its ordinary sense of an originator. The "author" of an uncopyrightable idea is nonetheless its author even though, for entirely valid reasons, the law properly denies him a copyright on the result of his creativity. And the Register's tentative constitutional argument seems questionable. It has not been supposed that the statutory grant of "authorship" status to the employer of a work made for hire exceeds the Constitution, though the employer has shown skill only in selecting employees, not in creating protectable expression.[5]

---

**4.** Two Circuits have adverted to the issue, but found it unnecessary to resolve it. The District of Columbia Circuit has quoted the passage from the Nimmer treatise that argues against a requirement of copyrightability for all contributions to a joint work but then discussed the issue in a footnote beginning *"If* Nimmer is correct...." *Community for Creative Non–Violence v. Reid,* 846 F.2d 1485, 1496 & n. 15 (D.C.Cir.1988) (emphasis added), *aff'd without*

*consideration of this point,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). The Third Circuit has explicitly held the issue open. *See Andrien v. Southern Ocean County Chamber of Commerce,* 927 F.2d 132, 136 (3d Cir.1991) (in banc).

**5.** Judge Friendly has suggested that the concept of authorship in the constitutional grant implies some limitations. "It would thus be quite

Nevertheless, we are persuaded to side with the position taken by the case law and endorsed by the agency administering the Copyright Act. The insistence on copyrightable contributions by all putative joint authors might serve to prevent some spurious claims by those who might otherwise try to share the fruits of the efforts of a sole author of a copyrightable work, even though a claim of having contributed copyrightable material could be asserted by those so inclined. More important, the prevailing view strikes an appropriate balance in the domains of both copyright and contract law. In the absence of contract, the copyright remains with the one or more persons who created copyrightable material. Contract law enables a person to hire another to create a copyrightable work, and the copyright law will recognize the employer as "author." 17 U.S.C. § 201(b). Similarly, the person with non-copyrightable material who proposes to join forces with a skilled writer to produce a copyrightable work is free to make a contract to disclose his or her material in return for assignment of part ownership of the resulting copyright. *Id.* § 201(d). And, as with all contract matters, the parties may minimize subsequent disputes by formalizing their agreement in a written contract. *Cf.* 17 U.S.C. § 101 ("work made for hire" definition of "specially ordered" or "commissioned" work includes requirement of written agreement). It seems more consistent with the spirit of copyright law to oblige all joint authors to make copyrightable contributions, leaving those with non-copyrightable contributions to protect their rights through contract.

There remains for consideration the crucial aspect of joint authorship—the nature of the intent that must be entertained by each putative joint author at the time the contribution of each was created. The wording of the statutory definition appears to make relevant only the state of mind regarding the unitary nature of the finished work—an intention "that their contributions be merged into inseparable or interdependent parts of a unitary whole." However, an inquiry so limited would extend joint author status to many persons who are not likely to have been within the contemplation of Congress. For example, a writer frequently works with an editor who makes numerous useful revisions to the first draft, some of which will consist of additions of copyrightable expression. Both intend their contributions to be merged into inseparable parts of a unitary whole, yet very few editors and even fewer writers would expect the editor to be accorded the status of joint author, enjoying an undivided half interest in the copyright in the published work. Similarly, research assistants may on occasion contribute to an author some protectable expression or merely a sufficiently original selection of factual material as would be entitled to a copyright, yet not be entitled to be regarded as a joint author of the work in which the contributed material appears. What distinguishes the writer-editor relationship and the writer-researcher relationship from the true joint author relationship is the lack of intent of both participants in the venture to regard themselves as joint authors.[6]

doubtful that Congress could grant employers the exclusive right to the writings of employees regardless of the circumstances." *Scherr v. Universal Match Corp.*, 417 F.2d 497, 502 (2d Cir. 1969) (Friendly, J., dissenting), *cert. denied,* 397 U.S. 936, 90 S.Ct. 945, 25 L.Ed.2d 116 (1970). He suggested that the "work for hire" doctrine, whether applied to employees or independent contractors (commissioned works) squares with the constitutional concept because vesting rights of authorship in the employer is what the parties "contemplated at the time of contracting, or at least what they probably would have contemplated if they had thought about it." *Id.* However, this seems more like a justification for transfer of ownership than for recognition of authorship. Though the United States is per-

haps the only country that confers "authorship" status on the employer of the creator of a work made for hire, *see Latman* at 114 n. 2, its decision to do so is not constitutionally suspect.

6. In some situations, the editor or researcher will be the employee of the primary author, in which event the copyright in the contributions of the editor or researcher would belong to the author, under the "work made for hire" doctrine. But in many situations the editor or researcher will be an independent contractor or an employee of some person or entity other than the primary author, in which event a claim of joint authorship would not be defeated by the "work made for hire" doctrine.

Focusing on whether the putative joint authors regarded themselves as joint authors is especially important in circumstances, such as the instant case, where one person (Childress) is indisputably the dominant author of the work and the only issue is whether that person is the sole author or she and another (Taylor) are joint authors. *See Fisher v. Klein,* 16 U.S.P.Q.2d 1795, 1798 (S.D.N.Y.1990); *Picture Music, Inc. v. Bourne, Inc.,* 314 F.Supp. 640, 647 (S.D.N.Y.1970), *aff'd on other grounds,* 457 F.2d 1213 (2d Cir.), *cert. denied,* 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972). This concern requires less exacting consideration in the context of traditional forms of collaboration, such as between the creators of the words and music of a song.

■ In this case, appellant contends that Judge Haight's observation that "Childress never shared Taylor's notion that they were co-authors of the play" misapplies the statutory standard by focusing on whether Childress "intended the legal consequences which flowed from her prior acts." Brief for Appellant at 22. We do not think Judge Haight went so far. He did not inquire whether Childress intended that she and Taylor would hold equal undivided interests in the play. But he properly insisted that they entertain in their minds the concept of joint authorship, whether or not they understood precisely the legal consequences of that relationship. Though joint authorship does not require an understanding by the co-authors of the legal consequences of their relationship, obviously some distinguishing characteristic of the relationship must be understood in order for it to be the subject of their intent. In many instances, a useful test will be whether, in the absence of contractual agreements concerning listed authorship, each participant intended that all would be identified as co-authors. Though "billing" or "credit" is not decisive in all cases and joint authorship can exist without any explicit discussion of this topic by the parties,[7] con-

sideration of the topic helpfully serves to focus the fact-finder's attention on how the parties implicitly regarded their undertaking.

An inquiry into how the putative joint authors regarded themselves in relation to the work has previously been part of our approach in ascertaining the existence of joint authorship. In *Gilliam v. American Broadcasting Companies, Inc.,* 538 F.2d 14 (2d Cir.1976), we examined the parties' written agreements and noted that their provisions indicated "that the parties *did not consider themselves joint authors* of a single work." *Id.* at 22 (emphasis added). This same thought is evident in Judge Leval's observation that "[i]t is only where the dominant author *intends to be sharing authorship* that joint authorship will result." *Fisher v. Klein,* 16 U.S.P.Q.2d at 1798 (emphasis added). And it echoes the approach taken by then-District Judge Learned Hand when he determined that the facts showed that two authors "*agreed to a joint authorship in the piece,* and that they accepted whatever the law implied as to the rights and obligations which arose from such an undertaking." *Maurel v. Smith,* 220 F. at 198 (emphasis added). *See also Weissmann v. Freeman,* 868 F.2d at 1318 (each of those claiming to be joint authors "must intend to contribute to a joint work."). Judge Haight was entirely correct to inquire whether Childress ever shared Taylor's "notion that they were co-authors of the Play."

Examination of whether the putative co-authors ever shared an intent to be co-authors serves the valuable purpose of appropriately confining the bounds of joint authorship arising by operation of copyright law, while leaving those not in a true joint authorship relationship with an author free to bargain for an arrangement that will be recognized as a matter of both copyright and contract law. Joint authorship entitles the co-authors to equal undivided interests in the work, *see* 17 U.S.C. § 201(a); *Community for Creative Non–Violence v. Reid,* 846 F.2d 1485, 1498

---

7. Obviously, consideration of whether the parties contemplated listed co-authorship (or would have accepted such billing had they thought about it) is not a helpful inquiry for works written by an uncredited "ghost writer," either as a sole author, as a joint author, or as an employee preparing a work for hire.

(D.C.Cir.1988), *aff'd without consideration of this point,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). That equal sharing of rights should be reserved for relationships in which all participants fully intend to be joint authors. The sharing of benefits in other relationships involving assistance in the creation of a copyrightable work can be more precisely calibrated by the participants in their contract negotiations regarding division of royalties or assignment of shares of ownership of the copyright, *see* 17 U.S.C. § 201(d).

■ In this case, the issue is not only whether Judge Haight applied the correct standard for determining joint authorship but also whether he was entitled to conclude that the record warranted a summary judgment in favor of Childress. We are satisfied that Judge Haight was correct as to both issues. We need not determine whether we agree with his conclusion that Taylor's contributions were not independently copyrightable since, even if they were protectable as expression or as an original selection of facts, we agree that there is no evidence from which a trier could infer that Childress had the state of mind required for joint authorship. As Judge Haight observed, whatever thought of co-authorship might have existed in Taylor's mind "was emphatically not shared by the purported co-author." There is no evidence that Childress ever contemplated, much less would have accepted, crediting the play as "written by Alice Childress and Clarice Taylor."

Childress was asked to write a play about "Moms" Mabley and did so. To facilitate her writing task, she accepted the assistance that Taylor provided, which consisted largely of furnishing the results of research concerning the life of "Moms" Mabley. As the actress expected to portray the leading role, Taylor also made some incidental suggestions, contributing ideas about the presentation of the play's subject and possibly some minor bits of expression. But there is no evidence that these aspects of Taylor's role ever evolved into more than the helpful advice that might come from the cast, the directors, or the producers of any play. A playwright does not so easily acquire a co-author.

Judge Haight was fully entitled to bolster his decision by reliance on the contract negotiations that followed completion of the script. Though his primary basis for summary judgment was the absence of any evidence supporting an inference that Childress shared "Taylor's notion that they were co-authors," he properly pointed to the emphatic rejection by Childress of the attempts by Taylor's agent to negotiate a co-ownership agreement and Taylor's acquiescence in that rejection. Intent "at the time the writing is done" remains the "touchstone," House Report at 120; Senate Report at 103, but subsequent conduct is normally probative of a prior state of mind. *See, e.g., United States v. Ramirez,* 894 F.2d 565, 569 (2d Cir.1990); *United States v. Tramunti,* 513 F.2d 1087 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

Taylor's claim of co-authorship was properly rejected, and with the rejection of that claim, summary judgment for Childress was properly entered on her copyright and unfair competition claims, and on defendants' counterclaim. The judgment of the District Court is affirmed.