SYSTEMS XIX, INC., dba Maritime Hall Productions, Plaintiff,

v.

L. PARKER, etc., et al., Defendants.

No. C97–3983 SI.

United States District Court, N.D. California.

Nov. 9, 1998.

David M. Given, Phillips & Erlewine LLP, San Francisco, CA, for Plaintiff.

Noel M. Cook, Timothy J. Humphrey, Owen Wickersham & Erickson, San Francisco, CA, Peter Herbert, New York City, for Defendants.

Noel M. Cook, Timothy J. Humphrey, Peter Herbert, (See above), for Zomba Recording Corporation, a New York corporation, dba Jive Records, defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ILLSTON, District Judge.

On November 6, 1998, the Court heard argument on defendants' motion for summary judgment. Having carefully considered the moving and opposing papers and the arguments of counsel, and for the reasons set out below, the motion is GRANTED in part and DENIED in part.

### BACKGROUND

Plaintiff Maritime Hall Productions (Maritime) owns Maritime Hall, a combined amphitheater and recording studio in San Francisco, California. Defendants are Lawrence Parker (Parker), a performer of rap music who performs under the name "KRS–ONE", and Zomba Recording Corporation (Zomba), the record company responsible for the marketing and distribution of Parker's songs. Zomba is the copyright owner of Parker's musical compositions and recordings.

In mid-January 1997, Albert Cook, a concert promoter, contacted Maritime's president, Boots Hughston, to arrange a concert involving Parker at the Maritime Hall. Over the course of the next four weeks, Cook, Hughston, and Wesley Powell, Parker's road manager, negotiated the terms of the performance contract.

According to Hughston, Cook explained to Hughston during the negotiations that Parker was creating a new album and that if Maritime were to record Parker's performance, those recordings might be used on the new album. Hughston Decl. ¶ 21. Hughston informed Cook that Maritime would require compensation and producer credits if Parker included a Maritime Hall recording on an album Although the parties' negotiations were reduced to an Artist Engagement Contract, neither party signed the agreement due, in part, to an inability to agree on terms relating to the production and recording of Parker's live performance. Hughston Decl. ¶ 20.

Parker states that he customarily records his performances for purposes of self-evaluation. Parker Decl. ¶ 9. On March 15, 1997, the day of the concert, Parker claims that since Parker's own sound engineer was absent, Powell requested Maritime to record the concert. Id. at 18. Maritime proceeded to set up its recording equipment, including stage and audience microphones, audio lines and video cameras. Powell and Hughston then discussed the recording process for the concert. According to Hughston, Powell observed the pre-concert recording set-up, asked some questions about the video cameras, but appeared primarily concerned with receiving "the master" of the performance.[1] Hughston Decl. ¶¶ 33–34.

Maritime recorded the concert and provided Powell with a master tape of the concert after the show.[2] In the summer of 1997, Parker released an album "I Got Next" (the

---

1. A "master" tape refers to a professional sound quality digital audio tape that has been mixed and equalized. Parker Decl., Exh. A, ¶ 1.2; Hughston Decl. ¶ 35.

2. Maritime maintains that, during the week following the show, Cook contacted Maritime and asked that a "re-mix" of the concert be sent to Powell. (A remix improves the sound quality of the recording and edits out unwanted noises). Maritime claims that it mailed a remix of the

album). Two tracks on the album were taken from the sound recording of the concert on March 15, 1997.[3] Although each of the remaining sixteen tracks on the album listed producer credits, the two tracks from the Maritime Hall concert sound recording contained no reference to producer credits or venue. Following the release of the album, Maritime requested compensation and producer credit listing from Zomba for its use of the sound recording on the album. Zomba did not reply to Maritime's request.

Maritime filed this action for declaratory relief and damages against Parker and Zomba on October 30, 1997. Maritime seeks a judicial determination of its rights under the Copyright Act with respect to the sound recording. In the alternative, Maritime seeks recovery in *quantum meruit* for Zomba's allegedly unauthorized use of the sound recording. Defendants filed the instant motion for summary judgment on August 7, 1998.

## LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the nonmoving party must set forth, by affidavit or

as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" See *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electric,* 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Ting v. United States,* 927 F.2d 1504, 1509 (9th Cir.1991). The evidence presented by the parties must be admissible. Fed.R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49 (2d Cir.1985); *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979). Hearsay statements found in affidavits are inadmissible. See, e.g., *Fong v. American Airlines, Inc.,* 626 F.2d 759, 762–63 (9th Cir.1980).

## DISCUSSION

### 1. Maritime's rights under the Copyright Act

Maritime claims joint copyright ownership of the sound recordings. Defendants respond that Maritime is not a joint author of the sound recordings because Zomba and Parker lacked the requisite intent to create a joint work and never authorized Maritime to use the underlying musical compositions to make the sound recording.[4]

---

concert recording to Powell. Powell, however, denies ever asking for, or coming into possession of, a remixed copy of the original sound recording. Since defendants do not acknowledge receipt of the alleged re-mix, the term "sound recording" for the purposes of this discussion refers only to the original recording made at the concert hall on March 15, 1997.

3. Defendants concede that segments of Maritime's original tape recording of Parker's concert were "utilized as segue material ... on the record album 'I Got Next.'" See Defendants' Answer ¶ 4.

4. Defendants contend that the sound recording is a "work for hire" under 17 U.S.C. § 101, and therefore Zomba, rather than parker, is the 'author' of the sound recording for purposes of the Act. The Court need not at this point determine whether the sound recording is in fact a "work for hire" under the test outlined in *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). If Parker is the author, the Court would look to his conduct in determining issues such as the intent or consent of the author. If Zomba is the author, the Court would still look to Parker's conduct where the facts, viewed in the light most favorable to Maritime, suggest that Parker was acting

Section 101 of the Copyright Act of 1976(Act) defines a 'joint work' as: "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." A party claiming joint authorship must establish that the authors 1) intended to merge their contributions into a unitary whole and 2) contributed copyrightable subject matter to the joint work. 17 U.S.C. § 101; *Ashton–Tate Corp. v. Ross*, 916 F.2d 516, 520–21 (9th Cir.1990).

## A. Intention of the parties

### i. The applicable standard

For a joint work to exist, the putative authors must have intended to merge their respective contributions into a unitary whole. 17 U.S.C. § 101. Defendants first argue that under *Childress v. Taylor*, 945 F.2d 500 (2d Cir.1991), the parties' intent turns on their *subjective* expectations. *Id.* at 507. Maritime responds that the courts scrutinize the subjective intent of the parties under the heightened *Childress* test only where the copyright claimant does not occupy a traditional authorship role as contemplated by Congress. In the case of sound recordings, Maritime argues that since Congress explicitly recognized the potential joint authorship roles of producer and artist, the *Childress* test is inapplicable to the instant facts. Rather than a subjective standard, Maritime contends that the parties' intent should be measured against an objective, factual standard as contemplated by the Act.

The Court agrees with Maritime that the subjective standard under *Childress* does not apply to the instant facts. *Childress* involved an actress/research assistant who claimed joint authorship of a play. The *Childress* court evaluated the intention of the parties based on a subjective standard to prevent the extension of "joint authorship status to many persons who are not likely to have been within the contemplation of Congress." *Id.*

In contrast to the playwright/research assistant relationship in *Childress*, the producer/performer relationship here was under the specific contemplation of Congress as joint authors of a sound recording under the Act.

Congress discussed in the Act's legislative history that "[t]he copyrightable elements of a sound recording will usually, though not always, involve 'authorship' both on the part of the performers whose performance is captured and on the part of the *record producer* responsible for setting up the session, capturing and electronically processing the sounds, and compiling and editing them to make a final sound recording." H.R.Rep. No. 94–1476, 94th Cong., 2nd Sess. 56 (1976) (emphasis added)

The standard by which the intent of the parties is measured is not strictly subjective as urged by Defendants. Rather, the requisite intent will be found if, based on an objective, factual standard, the parties prepared the sound recording "with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101; P. Goldstein, *Copyright*, 2nd ed., § 4.2.1 (1998).

### ii. Did Zomba possess the requisite intent to create a joint work?

Defendants contend that they did not share a mutual intent with Maritime to create a joint work in the sound recordings. Defendants argue that since neither Zomba nor Parker ever had any direct communication with Maritime, much less asked Maritime to professionally record the concert, defendants could not have intended the creation of a joint work with Maritime.

Maritime responds that defendants did share an intention with Maritime to co-author the sound recording, as demonstrated by copyright practice, industry custom, and the factual circumstances in which the sound recording was produced.

Maritime first argues that sound recordings by their nature are usually joint works. For example, according to the United States Copyright Office, "[s]ound recording authorship may be contributed by the performer or the record producer. Usually, authorship is contributed by both performer and producer." Compendium of Copyright Office Prac-

---

as Zomba's agent. Whether Zomba or Parker is considered the "author" of the sound recordings,

Parker's conduct is relevant to assessing the intent or consent of the parties.

tices, United States Copyright Office, § 495.01 at 400–37 (1984).

Maritime next argues that as an experienced artist, Parker understood the inherently collaborative nature of producing a live performance. Parker was aware of both the technical and creative efforts that are customarily required of producers, as well as the acknowledgment of those efforts through the industry practice of 1) crediting producers on an album for their contribution in recording a particular track and 2) requesting third party producers to transfer their rights in the track in exchange for royalty payments.

Finally, Maritime contends that when Parker requested, through his road manager, that Maritime record his performance, Parker intended to create a collaborative joint work with Maritime, in accordance with copyright practice and industry custom. Powell, the road manager, claims that he did not request a professional recording, but merely asked Maritime to activate a tape recorder. Maritime points out, however, that both Parker and Powell knew prior to the concert that Parker was going to be professionally recorded because the recording equipment, including large microphones and video cameras, was plainly visible from the stage.

After the concert, Parker's road manager left with the "master" tape. Parker and Zomba ultimately used the sound recording on the album. Maritime concludes that by requesting a recording of the concert, which was later commercially released, defendants intended that the parties merge their creative efforts in the production of a sound recording.

■ The Court finds that Maritime has demonstrated the existence of triable issues of fact with respect to the intention of the parties. Contrary to defendants' contentions, whether Zomba or Parker ever directly asked Maritime to record the concert is not dispositive of the question of the parties' intent. *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 267

(2nd Cir.1944) ("[I]t makes no difference whether the authors work in concert, or even whether they know each other, it is enough that they mean their contributions to be complementary in the sense that they are to be embodied in a single work to be performed as such.").

Maritime has submitted evidence that Parker requested Maritime to record him.[5] Parker knew Maritime was employing professional equipment while he was being recorded. Parker, through his road manager, sought out the tape after the concert, and ultimately used the tape on his album. From these circumstances a jury could reasonably conclude that Parker/Zomba and Maritime shared an implied agreement to jointly create a sound recording of the concert through the interdependent contributions of Parker's performance and Maritime's recordation and production thereof.

## B. Copyrightable contribution

Copyright protection applies only to those claimants that have made an original contribution. 17 U.S.C. 102(a). Maritime argues that it contributed copyrightable subject matter to the sound recordings through the arrangement and administration of recording equipment, the electronic processing of sounds, and the balancing, equalization, and integration of vocal, instrumental and audience components into a blended whole. *See Shaab v. Kleindienst*, 345 F.Supp. 589, 590 (D.D.C.1972) ("Sound recording firms [that] provide the equipment and organize the diverse talents of arrangers, performers and technicians ... satisfy the requirements of authorship found in the copyright clause").

Defendants contend, however, that as a matter of law, Maritime is precluded from making copyrightable contributions to the sound recording because Maritime did not have Zomba's consent to make those contributions. *See Pamfiloff v. Giant Records, Inc.*, 794 F.Supp. 933, 938 (N.D.Cal.1992). Zomba owns the exclusive copyright to the

---

**5.** In fact, Parker urged all concert-goers at Maritime Hall to record Parker's musical compositions. One of Parker's tracks recorded at Maritime Hall begins: "Anybody in here right now with tape decks, turn them on, and put them on record. I'll give you a second ... I want to add authenticity to your tape so that when it's sold out in the streets, you all can know this was a real party. These are poems circulating throughout the nation." Parker Decl., Exh. D.

musical compositions that form the basis of the sound recording. Defendants correctly maintain that to assert a claim of joint authorship over the sound recordings, Maritime must have obtained Zomba's permission to use Parker's musical compositions in the sound recordings. 17 U.S.C. § 103(a). Defendants conclude that since Zomba did not authorize Maritime to use the underlying compositions in the sound recording, Maritime had no legal right to make copyrightable contributions in the production of the sound recording.

■ Permission to employ pre-existing copyrighted material in a sound recording need not be in writing, but can be granted orally or implied from conduct in the form of a non-exclusive license. *Pamfiloff*, 794 F.Supp. at 938–39; M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.03[A][7]. Maritime argues that it received a non-exclusive license from defendants to use Parker's underlying musical compositions in the sound recording. Maritime contends that its license was implied from the following conduct: 1) Parker's road manager asked Maritime to record the performance; 2) Parker performed in front of two highly conspicuous audience microphones; and 3) Parker and Zomba accepted and released the sound recordings.

Defendants argue that since Zomba owned the copyrights to Parker's musical compositions, only Zomba could grant Maritime a license to use the compositions. Defendants contend that Maritime has presented evidence of an implied license based only on the conduct of Powell and Parker, and not of Zomba.

■ The Court finds that whether Maritime had an implied license to use Parker's musical compositions based on the conduct of Zomba or its agents is a question of fact that cannot be resolved on summary judgment. It is true that Zomba owns the copyright to Parker's musical compositions. Zomba, however, also vested Parker with the authority to perform those compositions at Maritime's venue. At the venue, Parker requested that Maritime record his musical compositions. Since Parker states that he "customarily" records his own performances, it should have come as no surprise to Zomba that Parker

asked Maritime to record the concert. Parker Decl. ¶ 9.

From these facts, a jury could reasonably conclude that Parker, vested with Zomba's authority to perform the copyrighted compositions, acted as Zomba's agent when he requested Maritime to record the concert. *See Skyways Aircraft Ferrying Service, Inc. v. Stanton*, 242 Cal.App.2nd 272, 281, 51 Cal. Rptr. 352 (1966) ("Where an agent has apparent authority to act in the business entrusted to him, and the [other party] has no knowledge actual or constructive of restrictions to the contrary, the agent's power to alter or modify is coexistent with that of his principal.")

In light of Zomba's later acceptance and commercial exploitation of the sound recordings, it is a question of fact whether Parker's request to record the performance constituted an implied license for Maritime to use the underlying compositions to produce the sound recording.

## 2. Maritime's unjust enrichment claim

Defendants contend that Maritime's equitable claim for unjust enrichment is preempted by the Copyright Act under 17 U.S.C. § 301. Maritime responds that preemption does not apply because the subject matter of its state law claim falls outside the scope of the Act.

Section 301(a) of the Act provides a three-part test to determine whether a state law claim is preempted by federal copyright law. First, the work on which the state claim is based must be fixed in a tangible medium of expression. Second, the work must fall within the subject matter of copyright as defined in §§ 102 and 103 of the Act. Third, the state cause of action must protect rights that are qualitatively equivalent to copyright protection as defined under § 106 of the Act. 17 U.S.C. § 301(a).

Under the first prong, neither party disputes that the sound recordings are fixed in the tangible medium of an audio cassette tape. Under the second prong, defendants argue that the work on which the claim for unjust enrichment is based is the sound recording, which falls within the subject matter

of the Act under § 102(a)(7). Maritime responds that the work at issue is not the sound recording, but rather the physical tape in which the sound recording is fixed. Maritime contends that the tape itself is a chattel, specifically a "phonorecord," that falls outside the scope of protection under the Act. 17 U.S.C. § 101.

The Court agrees with defendants that the work at issue is the sound recording rather than the tape in which the recording is fixed. Maritime's quasi-contract claim is not that defendants have been unjustly enriched by the retention of an audio cassette, but by the retention of a sound recording embodied in the audio cassette. The value to either party rests not in the tape, but in the sounds captured in the tape.

Under the third prong, defendants claim that the rights which Maritime seeks to vindicate in its unjust enrichment claim are qualitatively equivalent to the copyright protection embodied in § 106(1) and 106(2) of the Act. In its opposition, Maritime does not dispute defendant's argument

The Court finds that the rights which Maritime seeks to enforce in its claim for unjust enrichment is equivalent to the rights of a copyright owner under § 106(1) and 106(3) of the Act. Section 106(1) ensures a copyright owner the right "to reproduce the copyrighted work in copies or phonorecords." Section 106(3) protects the right of copyright owners to distribute those copies to the public for sale.

In its state law claim, Maritime seeks recovery from defendants for their wrongful profits from Maritime's interest in the sound recording. Under the Act, Maritime, as putative joint author, possesses the right under § 106(1) and 106(3) to share in the profits of Zomba's reproduction and distribution of the sound recordings Under federal copyright law or in *quantum meruit,* Maritime is seeking the same thing: compensation for the reproduction and distribution of the sound recordings. Under the third prong, therefore, the rights Maritime asserts under its state law claim are equivalent to rights within the general scope of copyright as specified in § 106.

■ The sound recording is a work of authorship fixed in a tangible medium of expression and the work comes within the subject matter of copyright under § 102(a)(7). Further, the rights sought to be vindicated in Maritime's unjust enrichment claim are rights involving reproduction and distribution that are clearly equivalent to the rights prescribed by § 106(1) and 106(3). Consequently, § 301(a) preempts Maritime's unjust enrichment claim.

### CONCLUSION

For the foregoing reasons, the Court DENIES defendants' motion for summary judgment of Maritime's claims under the Copyright Act, and GRANTS defendants' motion for summary judgment of Maritime's claims of unjust enrichment.

**IT IS SO ORDERED.**