Victor **HERBERT**, M.D., J.D., Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 92–672 C.

United States Court of Federal Claims.

Aug. 9, 1996.

Michael K. Botts, Prescott, Wisconsin, for plaintiff.

Robert G. Hilton, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, for defendant. Thomas J. Byrnes, Department of Justice, Washington, D.C., of counsel.

## OPINION

MOODY R. TIDWELL, III, Judge.

This is a suit for monetary damages for copyright infringement under 17 U.S.C. §§ 101–1101 (1994) (the Copyright Act). This court has jurisdiction pursuant to 28 U.S.C. § 1498(b) (1994). For the reasons set forth below, the court finds for defendant and dismisses the complaint.

## FACTS

### I. Background of the Case

This case arose out of a contract (the '2204 contract) entered into in 1980 between the National Institutes of Health (NIH), a governmental agency, and the National Academy of Sciences (the Academy), a private, non-governmental corporation. Under the contract, the Academy was to develop the 10th Edition of the *Recommended Dietary Allowances* (the 10th RDA). In 1980, the Academy empaneled the Committee on Dietary Allowances (the Committee or the Kamin Committee), a volunteer committee of which plaintiff was a member, to help prepare the 10th RDA. During the ensuing five years, plaintiff wrote and submitted three written works (the Herbert works) to the Committee—chapters on iron, folate, and vitamin B12—for inclusion in the 10th RDA. In 1985, the Committee submitted its final draft of the 10th RDA to the Academy. However, due to a disagreement between the Academy and the Committee, the Academy chose not to deliver the draft to NIH. Instead, it rejected the draft, dissolved the Kamin Committee, and reported to NIH its inability to submit the 10th RDA. Plaintiff later published revised versions of his contributions to the Kamin Committee as articles in a 1987 issue of the *American Journal of Clinical Nutrition* (the AJCN articles).

By March 1986, the Academy was at risk of defaulting under its contract with NIH. Consequently, NIH presented the Academy with three options: (1) recreate the report; (2) submit the existing draft with a full explanation of the relevant disputes; or (3) terminate the contract and return to NIH all of the funds paid to the Academy. Not surprisingly, the Academy chose to satisfy option number two, and submit the previously rejected draft. About a year later, after approval and edit of the final draft, NIH decided to publish the 10th RDA. NIH entered into a second contract with the Academy to "review, revise, and update" the draft. The Academy did so through the formation of a new committee, the Havel Subcommittee, which did not include plaintiff. This second contract was modified in 1991 with the addition of a clause whereby the United States government gave authorization and consent for any copyright infringement by the Academy. In October 1989, the Academy completed the task and submitted a final copy of the 10th RDA to NIH. The Academy then copyrighted the work in its own name and sold copies to the general public. At this time in October 1989, plaintiff obtained certificates of copyright registration in his own name for his contributions to the Kamin Committee manuscript, indicating 1985 as the date of creation.

### II. Procedural History

In 1990, plaintiff filed a copyright infringement action against the Academy in the United States District Court for the District of Columbia. The district court ruled that it lacked jurisdiction to hear the case because plaintiff's case was not against the Academy, but rather against the United States since the United States had assumed liability for any infringement by virtue of the authorization and consent clause which had been added to the second contract. *Herbert v. National Academy of Sciences*, No. Civ.A. 90–361, 1991 WL 387901, at *3–4 (D.D.C. May 22, 1991). The United States Court of Appeals for the District of Columbia Circuit affirmed this decision. *Herbert v. National Academy of Sciences*, 974 F.2d 192, 201 (D.C.Cir.1992).

Plaintiff subsequently filed an action in this court, alleging jurisdiction under 28 U.S.C. § 1498(b). In a peculiar motion, plaintiff initially suggested that this court lacked subject matter jurisdiction to hear the case. In an Order filed June 27, 1994, this court ruled that by the modification to the second contract, the United States had assumed liability for any breach of copyright by the Academy and that this court's jurisdiction was thus proper. Defendant then filed a motion for summary judgment, and plaintiff filed a motion for voluntary dismissal of Counts IV, V, and VI of his complaint.[1] The court denied the summary judgment motion, ruling that several issues of material fact existed. *Herbert v. United States,* 32 Fed.Cl. 293, 300 (1994). Plaintiff's motion for voluntary dismissal, however, was granted. *Id.* Defendant filed a motion for reconsideration which plaintiff opposed, and to which plaintiff attached a motion for sanctions. Trial was held from February 12–14, 1996. The parties then submitted post-trial briefs, and this court now renders judgment on the evidence presented.

### DISCUSSION

I. Plaintiff's Prima Facie Case: Copyright Infringement

To establish copyright infringement, plaintiff must prove (1) ownership of a valid copyright, and (2) copying by the alleged infringer. *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1295–96, 113 L.Ed.2d 358 (1991). Under the Copyright Act, copyright ownership "vests initially in the author or authors of a work." 17 U.S.C. § 201(a). The author is the person or persons who created the work. *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 2171, 104 L.Ed.2d 811 (1989). The parties do not dispute that Dr. Herbert is the creator of the works on vitamin B12, iron, and folate which are at issue here. Exs. 2–3, 5–6, 8–9. Thus, under section 201 he is

presumed to be the owner of copyrights in those works.

Copyrights are presumptively valid, and a certificate of copyright registration is considered prima facie evidence of a valid copyright. 17 U.S.C. § 410(c); *Norma Ribbon & Trimming, Inc. v. Little,* 51 F.3d 45, 47 (5th Cir.1995). By producing certificates of copyright registration for his contributions to the 10th RDA listing 1985 as the date of creation, plaintiff has established ownership of presumptively valid copyrights. Exs. 1, 4, 7.

Considering the second element of infringement, plaintiff claims that his works were copied in the 10th RDA. Copying may be shown either by direct evidence, or by showing that defendant had access to the copyrighted materials and that there is substantial similarity between the alleged infringing publication and the copyrighted publication. *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1372 (2d Cir.1993); *Marshburn v. United States,* 20 Cl.Ct. 706, 707 (1990). The test for copying is not explicitly defined, but considers whether, according to traditional equities, the amount of material copied verbatim goes beyond fair use. *See Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 574–78, 114 S.Ct. 1164, 1170, 127 L.Ed.2d 500 (1994); *Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985). A standard measure of similarity is whether the "ordinary person" would consider the works substantially similar. *Narell v. Freeman,* 872 F.2d 907, 913 (9th Cir.1989). Based on these standards, this court finds that evidence of copying is clear. Plaintiff's plagiarism experts, Mr. Walter Stewart and Dr. Ned Feder, testified that there was an extensive amount of duplication in the 10th RDA text from both Dr. Herbert's 1985 works and the 9th Edition of the *Recommended Dietary Allowances* (the 9th RDA). *See* Exs. 11, 77. The largest share of copied material was from the Herbert works and not from the

---

1. During consideration of the motions, the parties attempted to settle the case. "What ensued was a fiasco." *Herbert v. United States,* 32 Fed. Cl. 293, 300 (1994). The parties were warned by the court that "[s]tatements to the court shall be complete and thoughtful, and orders by the court shall be followed faithfully and quickly. Otherwise, the court shall consider imposition of sanctions." *Id.*

9th RDA. Based on trial testimony and the court's review of the evidence, the court finds that substantial similarity exists between the Herbert works and the 10th RDA. Concerning access, a witness testified at trial that in preparing the 10th RDA, the Havel Subcommittee began with the Kamin Committee manuscript. Thus, copying is established because the Academy clearly had access to the manuscript, and the court finds that the eventual publication was substantially similar to Dr. Herbert's works.

The parties disagree over exactly what was copied. At trial, defendant attempted to establish that it was the AJCN articles that were copied, apparently to show that by virtue of plaintiff's copyright assignment to the American Society for Clinical Nutrition, any infringement was of copyrights not owned by plaintiff, and hence plaintiff would have no cause of action. Defendant backed away from this position, stating that it makes no difference what was copied because actionable infringement will lie whether the works copied are original or derivative. Def.'s Post–Trial Br. at 3. Plaintiff also claims, but produced no credible evidence, that what was copied were the AJCN articles. He testified that the AJCN articles are the publications most similar to the works that were infringed.[2] However, plaintiff's plagiarism experts who testified about copying never considered the AJCN articles in their analysis. Moreover, the testimony that the Havel Subcommittee was working from the drafts produced by the Kamin Committee is consistent with plaintiff's own complaint and testimony about how the 10th RDA was created; that is, the Academy turned over its work product in 1985, then later edited and updated the Kamin manuscript to prepare it for publication. Based upon the evidence presented, this court finds that the Herbert works which were submitted to the Kamin Committee in 1985 are substantially similar to portions of the work ultimately published in the 10th RDA, and therefore plaintiff has satisfied his prima facie case of copyright infringement.

## II. The Government's Defense: No Right of Action

■ Defendant claims that it has a royalty-free license in the Herbert works under the provisions of 28 U.S.C. § 1498(b). Def.'s Post–Trial Br. at 16. Defendant's argument, however, mischaracterizes section 1498(b). This statute makes no mention of licenses to copyrighted material.[3] It is a jurisdictional statute which considers the right of action, not the conferring of a license, royalty-free or otherwise. Thus, this court has jurisdiction under 28 U.S.C. § 1498(b) to hear the claim to determine whether plaintiff has a right of action for copyright infringement against the government.

■ Section 1498 provides, in pertinent part:

(b) Hereafter, whenever the copyright in any work ... shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government, the exclusive remedy ... shall be by action against the United States in the Court of Federal Claims ...: *Provided,* That a Government employee shall have a right of action against the government ... except where he was in a position to order, influence, or induce use of the copyrighted work ...: *Provided,*

---

2. The testimony on this point was somewhat contradictory. For example, Dr. Herbert testified that his AJCN article on folate was "reprinted without attribution" in the 10th RDA, and that his 1987 AJCN articles were copied "verbatim" by the Academy. Trial Trans. at 141, 152; Ex. 61 at 2. Later in the same testimony he claimed that one of the articles was "bowdlerized" or altered by the Academy. Trial Trans. at 144. It is not entirely clear from the context of this last statement whether he was referring to the AJCN articles or the contributions to the 1985 Kamin Committee manuscript.

3. A patent or copyright license is essentially an agreement not to sue the licensee for infringement. *Harris v. Emus Records Corp.,* 734 F.2d 1329, 1334 (9th Cir.1984). Though a statute that denies a cause of action for infringement may thereby have some of the same effects as a license by preventing suit for infringement, it would not be accurate to say that such a statute actually grants a license.

*however,* That this subsection shall not confer a right of action ... with respect to any copyrighted work prepared by a person while in the employment or service of the United States, where the copyrighted work was prepared as a part of the official functions of the employee, or in the preparation of which Government time, material, or facilities were used. . . .

28 U.S.C. § 1498(b) (emphasis in original). The court must consider (1) whether Dr. Herbert, as a government employee, was in a position to influence or induce the use of his works, or (2) whether Dr. Herbert, as a government employee, produced the 10th RDA chapters as part of his official functions or duties or by using government time, materials, or facilities. The use of the word "or" in the statute indicates that satisfaction of any one of these conditions is sufficient to deny a right of action.

A. Government Employment

Dr. Herbert is a government employee. He has worked for the Veteran's Administration (the VA) since 1970. Dr. Herbert insisted that he was employed primarily as a professor at the Mt. Sinai School of Medicine (Mt. Sinai), and only secondarily at the Bronx VA Medical Center (the Bronx VA), and that at the time he created the Herbert works his duties at the Bronx VA included patient care only, and not research. The cumulative evidence at trial, however, belied this claim. The evidence showed that Dr. Herbert's position on the Bronx VA staff clearly was his primary employment, with his university affiliation playing only a far secondary role. He admitted that he was required to work at least 80 hours every two weeks on VA responsibilities at his VA laboratory and office. The court does not consider this amount of time to constitute secondary employment. Additionally, Dr. Herbert's supervisor at the Bronx VA, Dr. Rose, testified that to his knowledge Dr. Herbert's sole source of income at the time in question was from the VA. Further, the cover page of the work on vitamin B12 for which Dr. Herbert claims a copyright, and other publications, including the AJCN articles and his book entitled *Nutrition Cultism: Facts and Fictions,* all list his Bronx VA affiliation before his university status. Exs. 2, 53, 92. Moreover, the published version of the 10th RDA cites Dr. Herbert's affiliation with the Bronx VA only, and makes no mention of Mt. Sinai at all. Ex. 11. The court finds all of these factors to indicate that Dr. Herbert's primary employment is as a government employee with the VA.

B. Official Functions or Duties

The court now considers whether producing the 10th RDA chapters was a part of Dr. Herbert's official functions or duties. Despite Dr. Herbert's contentions to the contrary, research was clearly a part of his duties at the Bronx VA at the time he created the Herbert works. He received excellent performance ratings from the VA for his research. He even received the prestigious Middleton Award as the outstanding VA researcher for 1977. Most biographical references to Dr. Herbert, whether from co-workers, in his own writings or in other writings, refer to him as director of the Hematology and Nutrition Laboratory at the Bronx VA. Dr. Herbert's supervisors, Dr. Rose and Dr. Rosendorff, uniformly testified that research, teaching, and patient care were all part of Dr. Herbert's duties at both the Bronx VA and Mt. Sinai. Dr. Rose testified that Dr. Herbert's "function [at the Bronx VA] included ... conducting research in his field of expertise and publishing the results. . . ." Trial Trans. at 236. He further indicated that the Bronx VA considered Dr. Herbert such an outstanding researcher that it would be satisfied if he did nothing but research. Dr. Rosendorff testified that the research duties of doctors who are both VA and Mt. Sinai staff members are "indistinguishable," meaning that it is impossible to characterize the research of one doctor as being done as part of either his VA or Mt. Sinai duties alone.

Plaintiff presented evidence at trial that writing and publishing the 10th RDA was not a *specific* duty or condition of his employment from 1980 to 1985 at the Bronx VA, and therefore could not be considered part of his official duties or functions. However, the specific task need not be individual-

ly assigned in order to qualify as part of the official functions of a government employee. Where a government employee's official functions include research generally, the employee may be barred a right of action for infringement even where he was not specifically required to perform the work at issue. *Myers v. United States,* 147 Ct.Cl. 485, 489, 177 F.Supp. 952 (1959).[4] The evidence in this case indicates that research at the Bronx VA is initiated by individuals, and that the specific subjects of research are left to the researcher to decide, especially in the case of experienced, capable ones like Dr. Herbert. Furthermore, other government researchers, such as Dr. Levander, viewed their work on the Kamin Committee as part of their official governmental duties. These facts taken together lead the court to conclude that research in general was an official part of Dr. Herbert's duties at the Bronx VA, and that the type of research and writing involved in the creation of the 10th RDA was the type of work the VA expected him to do. Thus the court finds that the 10th RDA work was part of his official functions as a government employee at the Bronx VA, and under 28 U.S.C. § 1498(b) Dr. Herbert is denied a right of action on this basis.

The court further notes that the statute refers to "a person while in the employment *or service* of the United States." 28 U.S.C. § 1498(b) (emphasis added). Assuming *arguendo* that writing and publishing the sections of the 10th RDA were not an official part of his employment at the Bronx VA, these were official parts of his service on the Kamin Committee. The Kamin Committee was formed as a result of a government contract between NIH and the Academy, and the production of the 10th RDA was the express and official purpose of that Committee. Plaintiff knew that the 10th RDA project was funded by the government, through contract with the Academy. Thus, Dr. Her-

bert was in the service of the government through his service to the Academy. Therefore, plaintiff is further denied a right of action under 28 U.S.C. § 1498(b) because he produced the manuscripts as part of his official *service* to the government as a member of the Kamin Committee.

### C. Use of Government Time, Materials, or Facilities

The court next considers whether plaintiff used government time, materials, or facilities to create the Herbert works. The 10th RDA project involved literature research, not laboratory research, and thus could have been performed in locations other than a laboratory. Evidence at trial did not show conclusively during what times of the day Dr. Herbert did the actual writing of the Herbert works. In response to direct questions about the use of government time, witnesses at trial did not have direct knowledge of whether Dr. Herbert wrote the 10th RDA sections on government time. However, Dr. Herbert was a full-time VA employee during the entire time he served on the Kamin Committee, from 1980 to 1985.[5] By his own testimony, he began writing the chapters on B12, iron, and folate in 1980 and completed them in 1985. The testimony of witnesses confirmed that the 10th RDA project involved the type of research and writing that was consistent with his position at the VA. Plaintiff's office is located at the Bronx VA, and he produced no evidence which showed that this work was done anywhere other than his VA office or laboratory. Thus, this court concludes that it is more likely than not that Dr. Herbert produced the Herbert works while on government time.

There is no direct evidence that Dr. Herbert used significant government materials in writing the 10th RDA sections. The use of government facilities, however, is a different

---

**4.** The court in *Myers* considered the language of what is now subsection (a) of this statute, relating to patents. The reasoning in *Myers* holds here because the language of subsections (a) and (b) is nearly identical. *Myers,* 147 Ct.Cl. at 490, 177 F.Supp. 952; *see* 28 U.S.C. § 1498. Although *Myers* was a patent case, courts may appropriately look to patent law precedent where copyright precedent does not exist, because of the similarity and "historic kinship" of these two areas of the law. *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 439, 104 S.Ct. 774, 787, 78 L.Ed.2d 574 (1984).

**5.** The court notes that Dr. Herbert was on a leave of absence from the Bronx VA for one of those years.

matter. It was admitted in court, and stipulated by both sides that government facilities were used. Ex. 54, Resp. to Def.'s Req. for Admis. No. 37. Plaintiff argued at trial that because nothing other than the walls, floor, and ceiling of his laboratory belonged to the government—all of the equipment, etc., including that in the office, belonged to himself or Mt. Sinai—government facilities were in fact not used. This argument, however, is unpersuasive. The walls, floor, and ceiling of the laboratory are enough to qualify as government facilities. In spite of plaintiff's efforts to split hairs, it is clear that this was a government building, on government land, used for government purposes. Presumably the government pays the expenses for its maintenance and functioning, including heating, lighting, and electricity. Moreover, Dr. Herbert was a full-time government employee. Although Mt. Sinai may have furnished the equipment and even paid Dr. Herbert's assistants, this laboratory still occupied government facilities. Dr. Rose did not have direct knowledge about Dr. Herbert's use of government time, but he testified that Dr. Herbert in fact used the Bronx VA research facilities for his work on folate, iron, and vitamin B–12. Furthermore, Dr. Rose testified that using VA facilities to work on the 10th RDA project would be considered appropriate. This court concludes that Dr. Herbert did in fact use government facilities in the preparation of his 10th RDA writings, and thereby has no cause of action under 28 U.S.C. § 1498(b).

### D. Position of Influence

Under section 1498(b), the court considers whether plaintiff was in a position to influence or induce the use of his works during their creation. Dr. Herbert was a member of the Food and Nutrition Board (the FNB) from 1979 to 1985. The FNB presided over and supervised the Kamin Committee and had the power to make suggestions, which were taken seriously, regarding who was chosen for membership on the Kamin Committee. Thus by virtue of his membership on the FNB, Dr. Herbert was in a position to influence his own appointment to the Kamin Committee. Dr. Herbert was in fact appointed to the Kamin Committee in 1980, and

was a member of the Committee until it was dissolved in 1985.

Plaintiff purports that he did not use his position to influence the work of the FNB. Pl.'s Post–Trial Reply Br. at 5. This argument is futile. First, what is at issue is influence over the publication or use of Dr. Herbert's works, not influence over the FNB. Furthermore, the plain language of the statute does not require that he must have *actually* influenced the use of his work, but merely that he must have been *in a position* to influence its use. As a member of the FNB in 1979, Dr. Herbert was clearly in a position to influence his own appointment to the Committee in 1980, and thereby in a position to influence the Committee's use of his works. Plaintiff knew that as a member of the Committee his writings would be included in the 10th RDA. With some modifications, these writings were in fact ultimately published in the 10th RDA. These facts lead this court to conclude that Dr. Herbert was in a position to influence the use of his writings, and therefore he has no right of action for copyright infringement under 28 U.S.C. § 1498(b).

### III. The Parties' Additional Arguments

 Although the court finds that plaintiff has no right of action under 28 U.S.C. § 1498(b), the court deems it necessary to address the parties' remaining arguments due to the emphasis placed on these arguments at trial and in the post-trial briefs. While plaintiff has satisfied the prima facie case of infringement by demonstrating copying and producing certificates of copyright registration, the presumption of ownership and validity that this evidence creates is a rebuttable presumption. *Norma*, 51 F.3d at 47. The provisions of the Copyright Act carve out exceptions to the general rules of ownership vesting in the author, and prohibit copyrights in certain cases, or specify ownership in one other than the original author. These exceptions affect "collective works" and "joint works," among others.

### A. "Collective Works"

Plaintiff claims, and defendant denies, that the Kamin Committee manuscript was a "col-

lective work," and thus copyright of Dr. Herbert's separate contributions vests in him, the author, and only he could grant the government a license—which he alleges he did not do. Pl.'s Post–Trial Reply Br. at 9. "A 'collective work' is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101. Copyright in each separate contribution to a "collective work" normally vests in the author of the contribution, and "is distinct from copyright in the collective work as a whole." *Id.* § 201(c). The owner of the copyright in the "collective work" as a whole only acquires "the privilege of reproducing and distributing the contribution as part of that particular collective work, or any revisions or later editions of it." *Id.*

■ Plaintiff ignores, however, that if the 10th RDA is a "collective work," then his works which were contributions to it may qualify as "works made for hire." A "work made for hire" includes "a work specially ordered or commissioned for use as a contribution to a collective work." *Id.* § 101. The copyright in a "work made for hire" vests in the employer or person for whom the work was prepared, not the author. *Id.* § 201(b).[6] In this regard, plaintiff's argument that the 10th RDA is a "collective work" potentially undermines his own position because copyright ownership would never have vested in him in the first place if the 10th RDA qualifies as a "work made for hire."

The definition of a "work made for hire" requires a two-pronged analysis: (1) the work must be specially ordered or commissioned; and (2) it must be a "collective work." *Id.* § 101. The evidence shows that Dr. Herbert's works were not begun until after he joined the Committee, which was created pursuant to the Academy's contract with NIH. This indicates that their creation was specially ordered by the Academy. The court finds that the Herbert works therefore qualify as works "specially ordered or com-

missioned," and thus the first prong of the test is satisfied.

■ The second prong of this test requires a determination of whether the 10th RDA was a "collective work." The 10th RDA has some characteristics of a "collective work." For example, the chapters were written by individuals working alone, not in teams. The individual chapters can stand on their own as separate and independent works in some measure, as demonstrated by the publication of the AJCN articles. The nutrient table at the end of the book could be compared in some respects to an index in an encyclopedia which merely summarizes or categorizes the contents of the book. However, this court finds that the 10th RDA does not qualify as a "collective work" because it has more characteristics of a "joint work." The categories of "collective work" and "joint work" are distinct and mutually exclusive. H.R.Rep. No. 1476, 94th Cong., 2d Sess. 122 (1976); *reprinted in* 1976 U.S.C.C.A.N. 5659, 5738 ("[T]here is a basic distinction between a 'joint work,' where the separate elements merge into a unified whole, and a 'collective work,' where they remain unintegrated and disparate.").

Because the 10th RDA was not a "collective work," Dr. Herbert's contributions therefore do not qualify as "works made for hire" within the meaning of 17 U.S.C. § 101. Moreover, for that same reason, plaintiff's contention that Dr. Herbert is the sole owner of rights in his works and that only he could grant a license for their use in the 10th RDA also fails.

### B. "Joint Works"

■ Defendant asserts that the 10th RDA was a "joint work," and as such the copyright in the entire work is jointly owned by all of the authors. Defendant contends that any of the authors could therefore give the government a nonexclusive license to the work, which allegedly occurred when Dr. Le-

---

6. The parties to a "work made for hire" contract may, however, expressly agree to the contrary, and vest ownership of the work in one other than the employer or person for whom the work was prepared. *Id.; Real Estate Data, Inc. v. Sidwell Co.,* 809 F.2d 366, 371 (7th Cir.1987), *remanded*

*to* No. 78 C 2882, 1988 WL 79621 (N.D.Ill. July 27, 1988), *aff'd,* 907 F.2d 770 (7th Cir.1990), *cert. denied,* 498 U.S. 1088 (1991); *Marshburn,* 20 Cl.Ct. at 707. There is no evidence of such a contrary agreement in this case.

vander, a member of the Kamin Committee, assigned to the government whatever rights he had in the 10th RDA. Def.'s Post–Trial Br. at 26–27. "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. The touchstone of joint authorship is the intent of the authors at the time of creation, i.e., did they intend their work to be merged into a united whole, and did they intend that they be listed equally as co-authors. *Childress v. Taylor*, 945 F.2d 500, 505 (2d Cir.1991); *see also Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir.1994).

### 1. Intent of the Authors

Based on the evidence presented at trial, this court is convinced that the Kamin Committee intended to create a single unitary whole, and that Dr. Herbert's works were contributions to this unitary whole. In 1980, the Committee met, divided up the subject matter of the 10th RDA, and assigned researchers to write certain portions based on their particular expertise. Thereafter the Committee met regularly for approximately five years to discuss and comment on each individual's work and the 10th RDA as a whole. During these meetings, the Committee as a whole reviewed the existing drafts "line-by-line." Dr. Levander, a member of the Kamin Committee, testified that the Committee members intended that the drafts they created be merged into a unitary whole. Dr. Meyers, another Committee member, testified similarly. Plaintiff himself testified that the Committee wanted the parts of the book to "meld" together. He compared this work to co-authoring a textbook: "We wanted a coherent book, just like when I co-authored a textbook.... It was the same deal exactly." Trial Trans. at 88. Dr. Herbert also advised the other members of the Committee following its dissolution by the Academy, to include on all copies of their individual contributions a copyright designation citing the Committee as the copyright owner. This also indicates that he viewed it as a single unitary work. Furthermore, the Academy treated the Committee's manuscript as a single unitary work. When the Academy "rejected" the 10th RDA manuscript it did not reject the work of individual Committee members, but the manuscript as a whole. These facts indicate that the Committee as a whole intended to write a single work, not merely compile disparate contributions.

The evidence at trial also demonstrated that the Committee as a whole, not the individual authors, had complete control over the manuscript, which indicates joint control. The Kamin Committee had some authority to unilaterally change the writings of Committee members. For example, at one point, the work of one co-author was rejected, and another author was assigned by the Committee to revise and complete his contribution. Dr. Meyers, a member of the Committee who did not author sections of the work, nevertheless inserted changes into the text, and drafted small portions of it. After submitting a draft of a section to the Committee, the author did not necessarily have the final say on whether proposed changes were to be made. While the Committee made unilateral changes infrequently, this was apparently to maintain consensus and academic credibility, not due to lack of authority. The joint control indicated by these factors supports this court's finding that the 10th RDA was a "joint work."

The physical format of the 10th RDA further evidences the Committee's intent to create a "joint work." It was known and intended by the members of the Committee from the start that the ultimate goal was to publish a single unitary work which would be similar to the previously published 9th RDA. The physical format of the 10th RDA is essentially the same as that of the 9th RDA. In the 9th RDA, individual chapters do not start on a new page, but simply follow the one before it. Ex. 77. Individual authors are not credited for specific chapters anywhere in the book, nor are the Committee members recognized for their specific fields of expertise or research. Finally, Dr. Herbert himself testified that he expected that the Committee members be listed equally as co-authors. The expectation that contributors be listed equally as co-authors is an

additional factor indicating a "joint work." *Childress*, 945 F.2d at 508.

Considering the latter part of the definition of "joint work," Dr. Herbert's works are rightly viewed as "interdependent" parts of the unitary whole. "[P]arts of a unitary whole are 'interdependent' when they have some meaning standing alone but achieve their primary significance because of their combined effect...." *Id.* at 505. Independent publication of the AJCN articles indicates that Dr. Herbert's writings have independent meaning standing alone. However, the recommended nutrient level tables at the end of the 10th RDA, which were created by combining information from the each of the individual chapters of the book, strongly evidence that the Herbert works achieved their primary significance because of the combined effect of the contributions. Plaintiff and others testified that the nutrient tables are the most important part of the book, and may be the only parts of it that are actually used. The facts as a whole lead this court to find that the Kamin Committee intended to, and did in fact create a "joint work" rather than a "collective work."

### 2. Ownership and Licensing

The copyright of a "joint work" is co-owned by all of the authors. 17 U.S.C. § 201(a). Joint authors each hold an undivided interest in the entire work. *Erickson*, 13 F.3d at 1068; *Childress*, 945 F.2d at 508. Each co-owner has an independent right to use or license the use of the work without the consent of the other authors, subject to a duty of accounting to the other authors for any profits realized thereby. *Meredith v. Smith*, 145 F.2d 620, 621 (9th Cir.1944); *Strauss v. Hearst Corp.*, Civ. 10017, 1988 WL 18932, at *6 (S.D.N.Y. Feb. 19, 1988); H.R.Rep. No. 1476 at 121, *reprinted in* 1976 U.S.C.C.A.N. at 5736. Thus, as co-authors of a "joint work," the members of the Kamin Committee jointly owned a copyright to the 10th RDA manuscript, and each had the right to freely grant a nonexclusive license for its use to anyone they chose.

A license may be express or implied. An implied license is one derived from the conduct of the parties. 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPY-

RIGHT § 10.03[A], at 10–41 (1996). The existence and scope of such an implied license depends upon the facts of the individual case, but courts have found such licenses to exist where, for example, a person voluntarily submitted a work for publication. *MacLean Assocs., Inc. v. Wm. M. Mercer–Meidinger–Hansen, Inc.*, 952 F.2d 769, 779 (3d Cir. 1991); *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558–59 (9th Cir.1990), *cert. denied*, 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991). Delivery of a copy of the work is one type of conduct that demonstrates the existence of an implied license. *MacLean*, 952 F.2d at 779. In *Cohen*, the Ninth Circuit Court of Appeals found that by creating a work at defendant's request and conveying it to him, intending that it be copied and distributed, plaintiff necessarily conveyed a license because otherwise the conveyance would have been of minimal value. *Cohen*, 908 F.2d at 558–59. In the present case, as in *Cohen*, plaintiff and others worked on the 10th RDA at the Academy's request, and voluntarily created and conveyed their writings to the Academy. In doing so, the court finds that Dr. Herbert necessarily transferred a nonexclusive license for his works as well as the manuscript to the Academy, and by extension, to the government, because Dr. Herbert knew that the 10th RDA project was funded by the government through contract with the Academy.

The scope or extent of permissible use under an implied license is determined from the conduct of the parties. *See MacLean*, 952 F.2d at 779. The conduct of Dr. Herbert indicates that he anticipated the use, copying, publication, and distribution in book form of his writings, without receiving any remuneration. Plaintiff knew that the Committee's purpose was to publish a new edition of the RDA. He voluntarily participated on this Committee, and actively sought to get the manuscript published. Exs. 89, 99. His actions demonstrated an understanding that his articles would be published as part of the intended book, and that he would receive no royalties. These actions would lead a reasonable person in the Academy's position to believe that publication of Dr. Herbert's writings would be with his consent, and even

encouragement. This court concludes that Dr. Herbert granted the Academy an implied license to use, copy, publish, and distribute his writings in book form, and therefore the Academy had a right to grant a similar license to the government without becoming liable for compensation to him.

Furthermore, any of the authors of a "joint work" may grant a nonexclusive license without the permission of the others. *See Meredith,* 145 F.2d at 621. The conduct of the other members of the Kamin Committee during the period of creation of the Kamin manuscript was similar to Dr. Herbert's conduct during that time. They voluntarily delivered their writings to the Committee, and all expected that their work would be reviewed and published. This implies that they gave the Academy a license to their works. Furthermore, Dr. Levander, as a contributor to the Kamin manuscript, was a joint owner of the rights in the manuscript, and had the right to grant a nonexclusive license for the manuscript to the Academy. In 1987 he was invited to participate on the Havel Subcommittee to update the 10th RDA manuscript. By actively participating on this subcommittee, and not objecting to the free use of the 1985 manuscript, the court finds that Dr. Levander also gave the Academy an implied nonexclusive license to use and publish the 10th RDA manuscript.[7] Because the 10th RDA manuscript was a "joint work," assuming *arguendo* that plaintiff had not granted the Academy a license to use the manuscript as a whole, the court finds that the other members of the Committee did.

## IV. The Rights in Data Clause

Defendant claims that the government obtained a royalty-free, nonexclusive and irrevocable license to use and publish the Kamin Committee manuscript by the Rights in Data clause contained in the '2204 contract by reference. Def.'s Post–Trial Br. at 23. The Rights in Data clause provides that "the Government may use, duplicate, or disclose in any manner and for any purpose whatsoever, and have or permit others to do so, all subject data delivered under this contract." Ex. 20, '2204 Contract, Rights in Data Clause No. 15(b). It further provides that:

> [W]ith respect to any Subject Data which may be copyrighted the Contractor agrees to and does hereby grant to the Government a royalty-free, nonexclusive and irrevocable license throughout the world to use, duplicate or dispose of such data in any manner and for any purpose whatsoever, and to have or permit others to do so: *Provided, however,* That such license shall be only to the extent that the Contractor now has, or prior to completion or final settlement of this contract may acquire, the right to grant such license without becoming liable to pay compensation to others solely because of such grant.

*Id.* at Clause No. 15(c) (emphasis in original). The text of this standard government contract clause was published in the Federal Register. 37 Fed.Reg. 25,394 (1972), *amended at* 41 Fed.Reg. 41,695 (1976). As a member of one of the Academy's committees, Dr. Herbert can be presumed to have been aware of the existence and meaning of the Rights in Data clause. 44 U.S.C. § 1507 (1994); *Wolfson v. United States,* 204 Ct.Cl. 83, 94, 492 F.2d 1386 (1974) ("It is well settled that when regulations are published in the *Federal Register* they give legal notice of their contents to all who may be affected thereby." (emphasis in original)). If the Rights in Data clause applies to Dr. Herbert's writings, it gives the government an irrevocable, royalty-free license to publish and distribute them.

The '2204 contract expressly extended the Rights in Data clause to subcontractors: "Whenever any Subject Data is to be obtained from a subcontractor under this con-

---

7. The court notes that Dr. Levander also signed a written assignment transferring to the United States "all right, title and interest" that he may own in the copyrights to the 10th RDA. Ex. 95. Under 17 U.S.C. § 105, the government is not prohibited from receiving copyrights assigned to it. However, this purported transfer presents several problems. First, it took place in 1993, after the alleged infringement had occurred. Second, this document could only give the government whatever Dr. Levander owned, which was joint ownership of the undivided whole. It could not extinguish the rights of the other co-owners. Because there is adequate evidence to decide this case on other grounds, the court need not decide whether this transfer was valid.

tract, the Contractor shall use this same [Rights in Data] clause in the subcontract, without alteration, and no other clause shall be used to enlarge or diminish the Government's rights in that subcontractor Subject Data." Ex. 20, '2204 Contract, Rights in Data Clause No. 15(f). Therefore, to determine whether the Rights in Data clause applies to plaintiff, this court must first determine whether plaintiff was a subcontractor to the Academy as a member of the Kamin Committee, and whether he gave the Academy a license that it could convey to the government.

### A. Dr. Herbert as a Subcontractor

██ A subcontractor is one who agrees to perform part of the work that another party has already agreed to perform by contract with a third party. *Gulf States Enters. v. R.R. Tway, Inc.*, 938 F.2d 583, 587 (5th Cir. 1991); *Eastern Trans–Waste of Md., Inc. v. United States*, 27 Fed.Cl. 146, 149 (1992). The Academy was clearly under contract with NIH, a third party, to produce the 10th RDA, and Dr. Herbert agreed to perform part of the work of that contract.

██ While there was no written contract between plaintiff and the Academy, the court finds evidence sufficient to show an implied contract. The elements of a contract—offer, acceptance, and consideration—were all present. The Academy invited a number of eminent researchers to join the Committee for the purpose of writing and publishing a new edition of the RDA. This was an offer. Ten researchers, including plaintiff, accepted the invitation and joined the Committee. Dr. Herbert testified that professional recognition for scholarly publications has significant monetary value, in addition to the value of prestige, that one would normally expect. In fact, Dr. Herbert claimed that because he refused to transfer his copyright to the Academy, the nutrition grant authorizing committee of NIH shut off his $175,000 a year research grant. The 10th RDA was obviously of value to the Academy—they bargained for it. Thus Dr. Herbert agreed to provide something of value to the Academy, his writings on B12, folate, and iron, in exchange for literary credit, which was of value to him.

There may not have been any haggling, but the exchange of value constituting consideration is clear.

Plaintiff sometimes characterized his relationship with the Academy while a member of the Committee as that of a subcontractor. Though at trial plaintiff attempted to deny this admission and confuse the issue, his own complaint made the claim that he was a subcontractor several times. Ex. 91 at 3, 4. Moreover, in his deposition he referred to himself as a subcontractor. Ex. 101 at 11. While the parties' labels of themselves are not necessarily dispositive of the issue, the court considers this additional evidence persuasive. Based on all of these facts, the court concludes that Dr. Herbert was a subcontractor in an implied contract with the Academy under the '2204 contract, and the Rights in Data clause therefore applies to his writings, and extends to the government the right to use, duplicate, or disclose them under Clause 15(b).

### B. The Academy's License

██ When presumptively valid copyrights are involved, the government obtains a royalty-free license under the Rights in Data clause only to the extent that the contractor has such a license to grant. Ex. 20, '2204 Contract, Rights in Data Clause No. 15(c). There was no evidence presented during trial to show that Dr. Herbert expressly granted a license to the Academy at any time. However, this court has already determined that there was evidence that he gave the Academy an implied license to use, duplicate, publish, and dispose of the writings he submitted to the Committee. Implied licenses have also been found where the work was created under a contract containing a licensing clause similar to the Rights in Data clause here. *See Technical Dev. Corp. v. United States*, 220 Ct.Cl. 128, 151, 597 F.2d 733 (1979). By working as a subcontractor under a contract that gave the government a royalty-free, nonexclusive and irrevocable license to use, duplicate or dispose of data delivered under the contract, and then voluntarily delivering his works to the Academy, this court finds that Dr. Herbert necessarily gave the Academy a license to use and publish his works.

## CONCLUSION

While plaintiff has satisfied his prima facie case of copyright infringement, he has failed to overcome the government's defenses. Plaintiff clearly demonstrated that the 10th RDA includes substantially similar copies of his writings on vitamin B12, iron, and folate. However, under 28 U.S.C. § 1498(b) plaintiff has no cause of action. Moreover, the 10th RDA manuscript qualifies as a "joint work," not a "collective work," and the voluntary delivery of the work to the Academy by the Committee gave the government a license to use, copy, and distribute it. Finally, by virtue of the Rights in Data clause in the contract, the government also holds a nonexclusive, royalty-free license to use, copy, publish, and distribute the Herbert works. Accordingly, the court enters judgment for defendant on all counts. The Clerk is directed to dismiss the complaint. This opinion renders all outstanding motions and issues in this case, including the issues of damages and sanctions, moot.[8] No costs.

**IT IS SO ORDERED.**

---

8. Plaintiff's resurrection of the subject matter jurisdiction question both at trial and in the post-trial briefs is rejected. This court has subject matter jurisdiction over this case. The issue was decided by this court in the Order of June 27, 1994. The court will not consider it again. Plaintiff's attempts to litigate an issue on which the court has previously ruled cannot be tolerated. Though the question of subject matter jurisdiction may be raised at any point in the proceedings, this presumes that it has not already been decided.