**Richard J. ZITZ, Plaintiff,**

v.

**Leonel Bernadino Dos Santos PEREIRA and Peter Podlas, Defendants.**

No. CV 97–0575(ETB).

United States District Court, E.D. New York.

Sept. 30, 1999.

Daniel P. Burke, Thomas M. Galgano, Galgano & Burke, Hauppauge, NY, for Richard J. Zitz, Inc., plaintiff.

John L. Ciarelli, Ciarelli & Dempsey, Melville, NY, for Leonel Pereira, Leonel Bernadino Dos Santos Pereira, defendant.

Marie Ann Hoenings, L'Abbate, Balkan, Colavita & Contini, L.L.P., Garden City, NY, Paula M. Gart, L'Abbate, Balkan, Colavita & Contini, L.L.P., Garden City, NY, for Peter T. Podlas, defendant.

*MEMORANDUM OPINION*
*and ORDER*

BOYLE, United States Magistrate Judge.

### FACTS

This is an action for copyright infringement of a house design created by the plaintiff, Richard J. Zitz, Inc. ("Zitz").

The parties consented to have this action tried before me non-jury, pursuant to 28 U.S.C. § 636(c). This memorandum opinion and order constitutes my findings of fact and conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Richard J. Zitz, is a building contractor and the sole owner of the plaintiff,[1] a building contracting company that designs and makes single family houses in and around Southampton, New York. (Transcript of Proceedings, dated July 20–21, 1998 at 23–24) (hereinafter "Tr."). Zitz is neither an architect nor an engineer. (Tr. 242, 245.) As of the date of this bench trial, Zitz has built eight houses. (Tr. 24.) The first house at issue in this case (hereinafter "Townhouse I") was originally designed to fit within a triangular piece of property owned by Zitz on Little Noyack Path in Water Mill, New York. (Tr. 40, 64.) It was completed in 1991. Zitz built a second version of Townhouse I on Summerfield Lane in Bridgehampton and a third, with the addition of a breakfast nook, on Deerfield Road in Water Mill. (Pl.Ex. 4, 40; Tr. 45, 48–49, 271–72.) Zitz also designed a larger house based on the design of Townhouse I ("Townhouse II"), which had not been constructed as of the date of this trial. (Tr. 317.)

Zitz met the defendant, Leonel Pereira ("Pereira"), on a job site at which they both were working. (Tr. 63.) Pereira is a house painter. (Tr. 60, 368.) Zitz employed Pereira to paint the first house—at 45 Little Noyack Path—and the Summerfield Lane house. (*Id.*) During the course of his employment, Pereira told Zitz that he was interested in having Zitz build him a house similar to the Summerfield Lane house. (*Id.*) Subsequently, Pereira visited Zitz in his office at the Little Noyack Path house somewhere between ten and twenty times to discuss the plans for his future house (which was to become Townhouse II). (Tr. 64.) Zitz testified that he showed various plans and models to Pereira during those visits. (*Id.*) Townhouse II was designed in the same manner as Townhouse I and was based on the Deerfield Road house. (Tr. 53.)

Zitz helped Pereira find a piece of property on Uncle Leo's Lane, in Watermill, suitable for the new house. (Tr. 68.) As a condition of the contract to buy the land, Pereira was required to obtain the seller's approval of the plans for the dwelling to be built on the property. Zitz provided the plans to Townhouse I, which were annexed to the contract, and Zitz accompanied Pereira to the closing to keep them in his possession. (Tr. 66–68.) Pereira closed on the land on December 2, 1992. (Tr. 67.)

On January 3, 1993, Zitz drafted a contract for the construction of Pereira's proposed house on Uncle Leo's Lane. (Tr. 68–69.) Zitz gave Pereira two copies of the proposed contract. (Tr. 72.) Although Zitz did not give Pereira any drawings of Townhouse II, he did provide him with the proposed contract and the specifications for the house. (*Id.*) The specifications included, among other things, information about the building materials, plumbing and heating, the electrical system, and the frame measurements. (*Id.*) Zitz testified that he never gave any drawings to Pereira, and that it was not his practice to ever give plans to a customer until the construction contract had been signed. (Tr. 72–73, 75.) Zitz testified that after the contract was drafted, by coincidence, he spotted Pereira's van parked outside a real estate office in January 1993. (Tr. 73.) When he stopped in the office to inquire whether Pereira was there, he was informed that Pereira was across the street at the library making photocopies. (Tr. 73.) Concerned about what Pereira was copying, Zitz started towards the library. (*Id.*) There he ran into Pereira, who was carrying a manila envelope containing the still unexecuted contract and

---

1. Because Mr. Zitz is the sole owner of plaintiff, Richard J. Zitz Inc., for the sake of clarity, the Court will refer to Mr. Zitz and his corporation interchangeably as "Zitz" or "plaintiff."

the specifications on the house. (Tr. 74.) Zitz took the envelope away and said "I guess you're not going to be building this house" and then walked off. (Tr. 74, 280–81.) There were no plans in the envelope. (Tr. 74, 280–82.)

Pereira testified that this encounter occurred in January 1993. He testified that he had copied only the unexecuted contracts. He stated that the specifications were also in the envelope. (Tr. II 32.)[2] Zitz testified that Pereira had not photocopied any plans of Townhouse II, since they were not in the envelope, but that he believed Pereira had memorized his plans of the house. (Tr. 285.) Pereira built the house on Uncle Leo's Lane, using defendant architect Peter Podlas ("Podlas") later in 1993. (Tr. 374.) Pereira sold the house in 1995 or 96 and started to build the second house on Noyack Path shortly thereafter. (Tr. II 38.)

Zitz originally filed an action for copyright infringement against Pereira on March 3, 1996.[3] (Tr. 281; Def.Ex. E at 15.) In the 1996 complaint, Zitz alleged that:

> It was in late January 1993, when plaintiff's president, happened on the defendant Pereira in the Southampton Town Public Library photocopying the contract, plans, and specifications owned and produced by plaintiff that plaintiff first became aware of defendant Pereira's intention to proceed on his own with construction of the house, using all of the plans drawings and specifications obtained from plaintiff.

(Def.Ex.E, ¶ 15.)

As already noted, Zitz testified at trial that he did not catch Pereira copying plans

since none were included in the envelope. (Tr. 282.) Zitz further testified that Trunzo, his attorney at the time, was mistaken about the facts of that particular incident and erroneously included them in the 1996 complaint. (Tr. 282; Def.Ex. E, ¶ 15.) Zitz testified that the complaint in the instant action, filed February 4, 1997[4], and the first amended complaint filed February 14, 1997, also contained the same incorrect allegation. (Tr. 282, 289; Def.Ex. F at 9; Def.Ex G at 9.) Zitz testified that he did not remember when he noticed the error, but he told his attorneys about it as soon as he did. (Tr. 290–92.) On July 1, 1997 the second amended complaint was filed, without these allegations, simply stating that:

> In late January of 1993, plaintiff's president happened on defendant Pereira outside the Southampton Town Public Library with photocopies of the contract previously provided to defendant Pereira by plaintiff. Richard J. Zitz took the photocopies of the contract from defendant Pereira and told defendant Pereira not to build Town House II.

*Complaint,* ¶ 15.

At trial, Zitz testified that the first time he saw Pereira's house on Uncle Leo's Lane was late in 1994, after someone showed him a copy of Homes & Land Magazine that had pictured the house on page 33. (Tr 75–76; 307.) Zitz testified that the first time he saw Pereira's second house on Noyack Path,[5] which he claims is an unauthorized copy of Townhouse II, was on page 42 of a different Homes &

2. Tr. II refers to the transcript of the trial dated of July 22, 1998.

3. Civil Action Number 96–2237 was subsequently dismissed. Plaintiff filed the instant action on February 4, 1997. (Tr. 284; Def. Ex. F at 9.)

4. The within action appears to have been initiated in contemplation of dismissal of the 1996 action. That case, CV 96–2237, was dismissed on March 20, 1997, on the ground

that plaintiff had failed to establish good cause for the failure to effect service for more than eight (8) months after that action was commenced. *See* Rule 4(m), Fed.R.Civ.P.

5. Noyack Path is where Pereira built the second house at issue in this case. This is not to be confused with the house on Little Noyack Path, which was built by Zitz and is the first Townhouse I.

Land magazine at some time in the first half of 1996. (Tr. 78–81.) Zitz testified that shortly after seeing the Noyack Path house in Homes & Land he went to the property to see it. (Tr 78–81.)

Zitz lived in the Little Noyack Path house from September of 1992 through February of 1994. (Tr. 279.) Zitz testified that during this time he had traveled south on Little Noyack Path to Cooks Lane, but was unable to remember if he had during 1992 or 1993 when Pereira was building his house on Uncle Leo's lane. (Tr. 273–74.) A map of the area reveals that both of Pereira's houses were built very close to each other and also very close to the intersection of Cooks Lane and Little Noyack Path, which is within five miles of the Zitz house on Little Noyack Path. (Def.Ex. C.) In March of 1994, Zitz moved to 1879 Montauk Highway in Bridgehampton and lived there until October 1994. (Tr. 279.) The latter house is located approximately three miles south of Pereira's two houses. (Def.Ex. C.) In November 1994, Zitz moved to 77 Lake Drive, Southampton and lived there until January 1997. That house is approximately seven miles from the Pereira houses. (Tr. 280; Def.Ex. C.) From February 1997 through the date of this trial, Zitz was living at 219 Middle Land Highway, also in Southampton, and approximately five miles from the Pereira houses. (Tr. 280; Def.Ex. C.) Zitz testified that the community in which he and Pereira lived and worked is small. (Tr. 301.) Zitz testified that many of the roads in the areas are, or were at the times in question, nothing more than unpaved dirt paths, many of which were unmarked; he testified that this made it difficult to ascertain from a map which roads he actually traveled while living in those various areas. (Tr. 272.)

On cross-examination, the defendant introduced deposition testimony of Zitz relevant to when he first became aware that his Townhouse II design had been coped by Pereira. (Tr. 298.) The testimony related to a conversation that Zitz had with the purchaser of the Summerfield Lane house, Thomas Moore ("Moore"). (Tr. 297–99.) The application for a building permit on that house is dated October 16, 1991 (Df. Podlas' Ex. BB.) Moore reportedly commented to Zitz that he was upset because Pereira was constructing a house resembling his. (Tr. 297–98.) The relevant portion of the deposition testimony introduced at trial is as follows:

Question: When did [Moore] make these comments?

Answer: Do you want a date?

Question: Yes.

Answer: I don't know.

Question: Can you approximate?

Answer: Well, Thomas Moore had to be in and around the time that Mr. Pereira was building his house because they went and told me when I had found out that they were very upset that, you know, that they had suspected that he . had been around their house looking at things and bringing people around there, and it was bothersome to them.

(Tr. 298–99.) Zitz testified at trial that what he meant by this deposition testimony was that when he found out that Pereira had constructed what looked like a Townhouse II on Uncle Leo's Lane, he mentioned it to Moore. (Tr. 300.) Zitz testified that it was only after he told Moore about the house that Moore told him that Pereira had been lurking around his house and that he (Moore) had gone to visit Pereira's house while it was being constructed. (Tr. 299–300.) I credit Zitz' deposition testimony and not his testimony at trial concerning this incident.

Trudy Hortnagl ("Hortnagl"), Pereira's fiancé, testified that in July of 1993, she was visiting Pereira when they ran into Zitz and his wife while grocery shopping and that the Zitzes invited them to a party they were hosting the following week. (Tr. II 57.) Hortnagl testified that on the

day of the party, at around 3:30 in the afternoon, Zitz's wife called Pereira's house and uninvited them both "because Rick [Zitz] and Lionel [Pereira] are not friends anymore for what Lionel has done to him." (*Id.*)

## A. AUTHORSHIP OF THE COPYRIGHTS

Zitz designed the first version of Townhouse I, in part, based on the size of the building lot (the building "envelope"). (Tr. 30.) After determining the envelope, Zitz made a series of boxes, representing rooms, and fit them within the envelope. (Tr. 30–31.) After making the boxes, Zitz measured the dimensions of these rooms with a scaled engineer's ruler in order to determine their actual dimensions in feet. (Tr. 31.) Then, Zitz drew the floor plans of the house in accordance with those measurements. (*Id.*) Zitz added a hip roof, a true valley and reverse gables to create the dramatic look he desired for the house.[6] Zitz also requested his father to construct a styrofoam model of Townhouse I. (Tr. 36–38.) Due to local building code restrictions, Zitz was required to flatten out the top of the hip roof because the particular size and pitch of the roof made it higher than permitted. (Tr. 38–39.) Using the floor plans and the styrofoam model Zitz experimented with the roofs and elevations until he achieved the look he desired. (Tr. 51.)

When he was satisfied with the appearance of the house, he provided the floor plans and the model to Ed Erickson ("Erickson") of Suffolk County Consulting and Design ("SCD"), an architectural firm. (Tr. 52.) Along with these materials, Zitz also provided Erickson with floor plan vellums, on which he had drawn only wall and line designs. (Tr. 53.) Erickson created the architectural plans based on the vellums, the model and floor plan supplied by Zitz. (Tr. 53.) Zitz testified that he made all the decisions pertaining to the design of the house even though Erickson prepared the actual blueprints and legends. (Tr. 203–04.) Zitz testified that Erickson did what was needed to comply with all requirements of the Southampton Town building department. (Tr. 206.) The blueprints prepared by Erickson, as the architect, included the elevations, or the outside view, of Townhouse I and were originally prepared in November 1989. (Tr. 251.) Zitz testified that Erickson traced his first and second floor plans for Townhouse I in creating the dimensions in the blueprints. (Tr. 250–51.) Zitz's plans did not contain elevations, porches, decks or the grade levels for the house; these elements were created by Erickson. (Tr. 253.) Subsequent versions of Townhouse I and the plans for Townhouse II were created in essentially the same manner. (Tr. 47–49, 51–53.)

Erickson used the services of an independent engineer, Thomas Tully ("Tully"), who reviewed the blueprints prepared by Erickson for structural soundness prior to submission of the blueprints for the building department's approval in support of the request for a building permit. (Tr. 206–08.) Zitz never met Mr. Tully. Tully's engineering stamp appears on the blueprints submitted to the Town Building Department. (Tr. 206–208.) Zitz's father created styrofoam models of Townhouses I & II based on the same drawings that Zitz gave to the architect. (Tr. 54.)

## B. COPYRIGHT REGISTRATION

The architect prepared blueprints of Townhouses I & II, photographs of the inside and outside of two of the Townhouse I houses, and photographs of the styrofoam model of Townhouse II were submitted by Zitz and granted registration by the

---

**6.** A hip roof is a pyramid shaped roof. A reverse gable is a triangular-shaped pitched roof cut into the hip roof and usually contains a window. When the shape of the hip roof and reverse gables are carried through to the interior of the house, the effect is a cathedral ceiling with cut-outs, called true valleys, notched into the area where the vaulted ceiling and the walls of the room meet. (Tr. at 31, 41.)

Copyright Office on Feb 3, 1995, after all three versions of Townhouse I houses had been built by Zitz. (Tr. 271; Pl.Ex. 1–4) The architectural drawings submitted to the Copyright Office for Townhouse I were of the Deerfield Road house. (Tr. 264.) The exterior photographs were of the Summerfield Lane house and the interior photographs were of the Little Noyack Path house. (Tr. 265.) Although the architectural drawings submitted to the Copyright Office indicate two first floor wooden decks—off the living room and the dining room—the Deerfield Road house was actually built with brick patios instead. (Tr. 255.) The other difference between the three versions of Townhouse I is that the Deerfield Road house had the addition of a breakfast nook underneath the second floor deck. (Tr. 265).

### 1. *Townhouse I*

As already stated Zitz made two deposits and obtained two certificates of registration from the Copyright Office for Townhouse I. (Pl.Ex. 3 & 4.) Exhibit 3 is the registration of the architectural drawings prepared by Erickson and Exhibit 4 is the registration of Townhouse I as an architectural work. The deposit for the latter registration includes photographs of the Summerfield Lane and Little Noyack Path houses. The registration for the architectural drawings shows Zitz and SCD as co-authors, and that SCD transferred by assignment any rights it may have in the copyright of those plans. The drawings registration also states that the work was "made for hire." Exhibit 3 does not contain a date of first publication of the architectural plans, but indicates September "1991" as the completion date of this work. The architectural plans submitted with this deposit show that they were originally authored November 1989 and then revised in September 1991. (Pl.Ex.39.)

Exhibit 4, the certificate of registration for Townhouse I as an architectural work, does not indicate joint authorship by Zitz and SCD, and references photographs, which both parties have testified, were of two versions of Townhouse I built by Zitz, namely, the Little Noyack Path and the Summerfield Lane houses. Zitz transferred the copyright by assignment to his corporation. Exhibit 4 likewise does not contain a publication date but lists "1991" as the completion date of the architectural work.

As noted above, the building permit on the Little Noyack Path house, the first Townhouse I to be built, was issued in 1989. (Df.Ex.AA.) Zitz testified that he started construction on that house in 1990, and that he worked continuously until the house was completed in 1991. (Tr. 271.) Zitz could not remember when the roof, windows and siding on the house were installed. (Tr. 270.) Pereira testified that he painted the exterior of the Little Noyack Path house sometime in 1991. (Tr II 26.)

### 2. *Townhouse II*

Zitz also made two deposits with, and obtained two certificates of registration from, the Copyright Office for Townhouse II, as "Not Yet Constructed." (Pl.Ex. 1 & 2.) Exhibit 2 is the registration for the "blueprints of Architectural Work," consisting of photographs of the styrofoam model Zitz's father made of Townhouse II. It does not show joint authorship, but does show a "work for hire." It is undisputed that Erickson, the architect, and Tully, the engineer who prepared these drawings, were never in the plaintiff's employ, but rather were retained as independent contractors. Exhibit 2 does not contain a first publication date and states that the completion date of the architectural work is "1993." Exhibit 1 is the other certificate of registration for Townhouse II, and is for the "Architectural Work" of Townhouse II. It does not indicate joint authorship with SCD and does not contain a first publication date. This exhibit also lists "1993" as the completion date for this work.

## C. *REPRESENTATIONS TO THE COPYRIGHT OFFICE*

In April of 1995, the Copyright Office, noticing SCD's logo on the architectural plans submitted by Zitz, contacted Zitz's lawyer, Patrick Trunzo ("Trunzo") to ascertain the authorship of the plans. (Pl. Ex.5.) Trunzo explained that Erickson had made "no authorship contribution to the technical drawings." (Tr. 200; Pl.Ex. 5.) Thereafter, Trunzo sent correspondence to the Copyright Office stating that SCD was an independent contractor hired by Zitz to "draw the building's elevations to scale from the model and to reproduce the floor plans as construction drawings." (Pl. Ex.5.) Trunzo further stated that Suffolk Consulting and Designs prepared its drawings by "literally drawing or tracing over" floor plans provided by Zitz. Trunzo also stated that in light of SCD's independent contractor status, he may have checked the "work for hire" box in error. (*Id.*) He further stated that "[i]f in order to put the application in proper form to accomplish the registration, it is necessary to amend the application to show Mr. Zitz and/or [SCD] as the authors of the technical drawings you have my client's authorization to do so. . . . If you deem it appropriate to amend the application, please then also amend the application to show the transfer of the ownership of the drawings which have been absolutely transferred by assignment to [Zitz]." (*Id.*) The registration certificate was never changed, although Trunzo's correspondence with the Copyright Office is a matter of record (Zitz Ex. 5.).[7]

## DISCUSSION

■ Pleadings in other actions may constitute admissions under Federal Rule of Evidence 801(d)(2) "and are admissible in the case in which they were originally filed as well as in any subsequent litigation involving that party." *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir.1984). "A party thus cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories." *Id.*

■ Prior inconsistent pleadings "are controvertible, not conclusive, admissions." *The Limited, Inc. v. McCrory Corp.*, 683 F.Supp. 387, 395 n. 5 (S.D.N.Y.1988) (citing McKeon, 738 F.2d at 31.) *See Dweck v. Pacificorp Capital, Inc.*, No. 91 Civ. 2095, 1998 WL 88742, at *7 (S.D.N.Y., Mar. 2, 1998) ("[i]t is well-established in the Second Circuit that superseded pleadings, while not judicial admissions per se, may be introduced as evidence and considered an admission.").

> While there may be a rare occasion to disregard the contradictory and manipulated allegations of an amended pleading, *see Wallace v. New York City Dep't of Corrections*, No. 95 Civ. 4404, 1996 WL 586797, at *2 (E.D.N.Y. Oct.9, 1996), the more usual and benevolent option is to accept the superseded pleadings but allow the factfinder to consider the earlier pleadings as admissions in due course. *See The Limited, Inc.*, 683 F.Supp. at 395 n. 5 (finding dismissal of contradictory, amended pleadings unwarranted).

*Barris v. Hamilton*, No. 96 Civ. 9541, 1999 WL 311813, slip op. at *2 (S.D.N.Y. May 17, 1999).

> A pleading prepared by an attorney
>
> is an admission by one presumptively authorized to speak for his principal. When a pleading is amended or with-

---

7. A letter, drafted by Zitz, transferring all rights of SCD in the copyrights was marked for identification during the trial but was never admitted into evidence. (Tr. 213–217.) It should be further noted that in *Zitz v. Curran*, No. 97–CV–0576 (E.D.N.Y. Nov. 9, 1998) (denying motion for summary judgment at 4), this letter was described as composed by Zitz and signed by Erickson on March 13, 1997, almost two years after the amendment to the copyright registrations, and after commencement of the within action.

drawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extra-judicial admission made by a party or his agent. If the agent made the admission without adequate information, that goes to its weight, not its admissibility.

*Savino v. Computer Credit,* 960 F.Supp. 599, 602 (E.D.N.Y.1997) (citations omitted). The prior pleading may also be used to impeach the credibility of the plaintiff. *Id.*

### A. *Statute of Limitations*

Civil actions under the Copyright Act are subject to a three-year statute of limitations. *See* 17 U.S.C. § 507(b). Pereira built the house on Uncle Leo's Lane in 1993. Pereira maintains that this action was not commenced until March 1997 and is time-barred.

A cause of action accrues when a plaintiff knows or has reason to know of the injury upon which the claim is premised. *See Stone v. Williams,* 970 F.2d 1043, 1048 (2d Cir.1992), *cert. denied,* 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993). A cause of action in a copyright infringement case accrues when "a reasonably diligent person in plaintiff's position would have been put on inquiry" as to the existence of a right. *Stone,* 970 F.2d at 1048. Such is the case here.

Zitz testified that when he heard that Pereira was at the library making photocopies he became concerned and went to see what he was copying. Neither party claims that Pereira photocopied the blueprints for Townhouse II. Zitz testified that Pereira had been to his house on Little Noyack Path somewhere between ten and twenty times to discuss the design of Townhouse II. Pereira testified that he had done some painting work for Zitz on both the Little Noyack Path house as well as the Summerfield Lane house. I conclude that this evidence proves that Pereira had access to the plans for Townhouse I which, at one point, Zitz was going to build for him. Thus, Pereira was intimately familiar with the design of Townhouses I and II.

These findings of fact lead me to further conclude that a reasonably diligent person in Zitz's position would have further investigated Pereira's activities once he knew that Pereira was not going to be contracting with him to build Townhouse II. Zitz knew that Pereira was intimately familiar with the plans and could copy his plans from memory. He was obviously concerned about his plans being copied by anyone, as is evidenced by his policy of never releasing plans to a client until the contract was signed. In fact, Zitz had accompanied Pereira to the closing on the Uncle Leo's Lane real property in order to keep the plans in his possession. Moreover, when Zitz heard that Pereira was using a photocopy machine in the library he became concerned about what he might be copying—even though Pereira possessed only the contract and the specifications—and headed straight for the library to further investigate. The evidence introduced by both parties at trial proves that Zitz was disturbed by that encounter with Pereira. Both parties lived and worked in a small community. Zitz lived less than five miles from Pereira's site at Uncle Leo's Lane, and Zitz helped Pereira purchase the Uncle Leo's Lane property in order to facilitate the building of Townhouse II and therefore was well aware of its location. Zitz's trial testimony as to when he first had reason to reasonably suspect an infringement by Pereira is also inconsistent with the testimony of Pereira's fiancé, Trudy Hortnagl, who testified that in July 1993 Zitz and his wife refused to attend a party hosted by Pereira because they were no longer friends due to what Pereira had done. The court credits Hortnagl's testimony and discredits Zitz' testimony that he first learned of the infringement in 1994 when he saw the Uncle

Leo's Lane house in a Homes & Land Magazine.

This finding is further supported by the prior inconsistent pleadings, which I find constitutes a judicial admission inconsistent with Zitz's posture at trial. Three pleadings authored by two attorneys from different law firms make the same allegations that Zitz first learned of Pereira's intent to build a Townhouse II when he ran into him on the library steps. The evidence adduced at trial clearly supports this allegation and leads me to conclude that Zitz's cause of action for infringement on the first house Pereira built accrued more than three years before the filing of this action. I therefore find that this action against Pereira and his architect, Podlas, is barred by the applicable statute of limitations as it relates to Pereira's first house on Uncle Leo's Lane.

## B. *Laches*

■ Laches is an equitable doctrine which "bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir.1997) (citation an internal quotations omitted). Under the doctrine of laches "[t]he prevailing rule ... is that when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim, at least where the statute contains an express limitations period within which the action is timely." *Id.* at 260.

To the extent that Zitz seeks money damages on claims entirely derived from the Copyright Act, a federal statute, the claims of infringement have an express limitations period of three years. As previously discussed, the infringement claim on the first house Pereira built on Uncle Leo's Lane falls outside the limitations period, making it unnecessary for defendants to affirmatively defend that claim based on laches. The infringement claim regarding the second house that Pereira built in 1995 at 45 Noyack Path falls within the three-year limitations period, and therefore laches is not available to bar those claims.

## C. *Copyright Validity*

■ In order to maintain a copyright infringement action, Zitz must establish two requisite elements: (1) the possession of a valid copyright and (2) copying of the original elements of a work. *See Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir.1996) ("two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.") (citations omitted).

■ A certificate of copyright registration is prima facie evidence of the copyright's validity. 17 U.S.C. § 410(c); *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir.1997). The Copyright Office has expertise to determine whether a filer has complied with the requirements for a registration certificate. *Fonar* 105 F.3d at 105. A party's possession of the certificate creates a rebuttable presumption that the work is copyrightable. *Id.* at 104; *Imperial Toy v. Goffa Int'l Corp.*, 988 F.Supp. 617, 619 (E.D.N.Y.1997).

■ The presumption of validity is rebutted however, "[w]here other evidence in the record casts doubt on the question." *Durham Indus. v. Tomy Corp.*, 630 F.2d 905 (2d Cir.1980). Examples of such rebuttals include showing that a work was copied from the public domain, and that a work was a "non-copyrightable utilitarian article." *Fonar*, 105 F.3d at 104 (citing cases). Moreover, "[i]t is the law of this Circuit that the 'knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] reason for holding the registration invalid and thus incapable of supporting an infringement action.'" *Eckes v. Card Prices Update*, 736 F.2d 859, 861 (2d Cir.1984) (citations omitted). Under the doctrine of fraud on the Copyright Office, "the presumption of validity may

only be overcome by proof of deliberate misrepresentation." *Santrayall v. Burrell*, 993 F.Supp. 173, 176 (S.D.N.Y.1998) (citing *Fonar*, 105 F.3d at 105). In contrast, omissions that are inadvertent or innocent will not result in the invalidation of the copyright. *Id.* (citing *Eckes*, 736 F.2d at 861).

Architectural works have been specifically afforded copyright protection since 1990. *See* 37 C.F.R § 202.11(a) (1998) ("This section prescribes rules pertaining to the registration of architectural works, as provided for in the amendment of title 17 of the United States Code by the Judicial Improvements Act of 1990, Public Law 101–650.") Before 1990, architectural plans, although not specifically named in the Copyright Act, were granted protection as "technical drawings, diagrams and models" under 17 U.S.C. § 101. Prior to that time, only architectural works that served no useful purpose, such as monuments, were entitled to protection under the Copyright Act. *See* Nimmer on Copyright § 2.20.

## 1. *Authorship*

Copyright ownership vests initially in the author or authors of a work. 17 U.S.C. § 201(a) (1998). As a general rule, "the author is a party who actually creates the work, that is, the person who translates an idea into a fixed tangible expression entitled to copyright protection." *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). The "copyright does not protect an idea, but only the expression of an idea." *Kregos v. Associated Press*, 3 F.3d 656, 663 (2d Cir.1993); *see also Warner Bros., Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 239–40 (2d Cir.1983); *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea....").

The defendants maintain that the architect (Erickson) prepared the blueprints and Tully was responsible for the engineering aspects of the plans and therefore Zitz was not the author of the architectural plans of Townhouses I & II. Defendants also claim that Zitz's application for copyrights of these plans were knowingly false and that the copyright registrations are, therefore, invalid. They further claim that the copyright registration for Townhouse I as an architectural work is invalid because the deposit is comprised of photographs of the exterior of one house and the interior of another. They also claim that the copyright registration for Townhouse II as an architectural work is invalid because, again, Zitz was not the author of the styrofoam model depicted in the photographs accompanying the application.

### a. *The Architectural Plans*

Zitz obtained copyright registrations for the architectural plans of Townhouses I & II, which were drawn by Erickson pursuant to Zitz's instructions, sketches, and ideas. In *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486 (11th Cir. 1990), the Eleventh Circuit Court of Appeals held that the plaintiff, a house builder, was not the author of architectural plans which appeared in a copyrighted advertising flyer and were allegedly copied by the defendant. *Id.* at 1492. The plaintiff had provided a drafting company with sketches of the floor plans, reviewed the work in progress and had final approval on the finished plans. *Id.* at 492–93. The plaintiff claimed it owned the copyright as a "work for hire" and, alternatively, as a co-author. The court first held that, according to § 101(2) of the Copyright Law, plaintiff could not claim the plans are a "work for hire" because "(1) architectural drafting does not fall within the nine enumerated categories of activities which may be done by independent contractors 'for hire' and (ii) there is no evidence that the plaintiff, MGB, and [the drafting company it hired] had a contract stating that the drawings would be considered a work for hire." *Id.*

The court also addressed whether MGB was a co-author of the plans under 17 U.S.C. § 201(a) which states that "[t]he authors of a joint work are co-owners of copyright in the work." A "joint work" is defined as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of the unitary whole." 17 U.S.C. § 101 (West 1998). The court explained the terms "inseparable" and "interdependent" as follows:

> [I]f author B's contribution when combined with author A's contribution results in recasting, transforming or adapting A's contribution, then the two contributions may be said to be inseparable. If the process is simply one of assembling into a collective whole A's and B's respective contributions, without thereby recasting A's contribution, then the two contributions may be said to be interdependent.

*Id.* at 1492–93 (citing 1 Nimmer of Copyright § 6.04 at 6–11 (1989)). The court held that:

> There is no evidence that it was the intent of either [the plaintiff] or [the drafting company] that this concept (the sketch [of the house]) become part of the finished expression (the architectural plans and drawings). In fact, the sketch did not form an 'inseparable or interdependent' part of the final house drawings.

*Id.* at 1493.

This holding is almost identical to that in the case of *Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Construction*, 542 F.Supp. 252 (D.Neb.1982), wherein the Nebraska District Court held that defendant, a developer, was not a co-author of architectural plans drawn by the plaintiff, even though it had provided sketches, descriptions, ideas and had final approval authority over the plans. The court held that the evidence presented at trial established that the defendant was (1) not an author of the design and its contributions to the authorship of the plans were *de minimis* and (2)

the parties never intended that the finished plans be a work of joint authorship. *Id.* at 258.

In *Childress v. Taylor*, 945 F.2d 500 (2d Cir.1991), the Court interpreted 17 U.S.C. § 201(a), the section governing joint authorship, where parties failed to sign a written agreement dealing with co-authorship. The court held that collaboration alone is not enough to establish joint authorship, rather the contributions of each joint author must be independently copyrightable, *see id.* at 507, and the authors must have "entertain[ed] in their minds the concept of joint authorship." *Id.* at 508.

Zitz's certificate of copyright for the Townhouse I architectural plans shows SCD as a co-author of the blueprints and that SCD's rights were assigned to Zitz. When the Copyright Office inquired further in April 1995, Zitz deliberately misrepresented the participation and responsibility of Erickson and Tully in the preparation of the drawings by asserting that Erickson prepared the drawings "by literally drawing or tracing over them." *Letter of Trunzo to Register of Copyrights*, dated April 14, 1995 at 1. (Pl. Ex.5.) Additionally, Zitz misrepresented that "the drawings ... have been absolutely transferred by assignment to the claimant...." Id. at 2. The evidence submitted at trial proves that Zitz intentionally misrepresented his authorship of the Townhouse I plans to the Copyright Office. Moreover, Erickson and Tully were both independent contractors, and there was no agreement as to co-authorship or assignment at the time these misrepresentations were made. Zitz knew that SCD's contributions to the plans should have been disclosed to the copyright office. There is no corresponding disclosures with respect to the registration for the blueprints of Townhouse II.

Zitz admitted that Erickson created all the elevations, adding the grading and porches, steps and stoops, with no input

from Zitz. (Tr. 51, 246.) Zitz also testified that he provided Erickson with detailed drawings and styrofoam models, to assist Erickson in the rendering of the final architectural drawings. (Tr. 246–47.). Zitz also testified that he gave Erickson blueprint vellums with just the barest of lines drawn on it so that Erickson could draw in the technical specifications. (Tr. 53.) There was no testimony, however, that a single line in either sets of blueprints Zitz deposited with the Copyright Office was actually drawn by Zitz.

Moreover, Zitz's floor plans for Townhouse I provide only the most basic of specifications as far as the size and layout of the inside of the house. There are no indications as to the height and pitch of the true valley and reverse gables and only the most basic of information regarding the dimensions of the rooms and the location of elements such as stairs, doors and windows. (Id.) While Zitz's plans for Townhouse II contain more detail than Zitz's Townhouse I plan, e.g. the dimensions and pitch of the true valley and reverse gables as well as more detailed specifications for elements such as windows, doors and staircases, building materials and fixtures (Pl.Ex.47), the fact remains that Zitz did not have the expertise, as well as the authority, to prepare plans required by the Town in support of an application for a building permit.

Erickson did not testify, either in person or by deposition, at trial. The court has therefore not received his version as to any contribution Zitz made toward the creation of the technical drawings, or as to any understanding he may have had with Zitz regarding the ownership of the copyright. The court will not draw an adverse inference from plaintiff's failure to depose or call Erickson, since there is no proof that he was subject to plaintiff's control and he was equally available to the defendants. *See U.S. v. Funds Held in The Name or For The Benefit of Wetterer,* 17 F.Supp.2d 161, 186 (no adverse inference may be drawn by a party's failure to call a witness, not in control of that party and equally available to either party).

By statutory definition, "[a]n 'architectural work' is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101.

Zitz did not file his own sketches of the floor plans for Townhouses I & II with the Copyright Office. Instead, he filed the plans prepared by Erickson and Tully, which Zitz did not prepare. I therefore conclude that Zitz did not author the architectural plans deposited with the Copyright Office, that he deliberately misrepresented the true facts to the Copyright Office, and that the defendants have successfully rebutted the presumption of validity embodied in the registration of technical drawings of Townhouses I & II. *See e.g., Eckes v. Card Prices Update,* 736 F.2d 859 (2d Cir.1984). I do not credit Zitz's testimony that Erickson and Tully simply traced his plans. Such conduct constitutes a crime under New York law, and the court does not credit such testimony. Both the architect and the engineer participated in the preparation of these plans, as they were both duly licensed to do under state law. *See* New York Education Law §§ 7205, 7206, 6508, 6509. *See Charlebois v. J.M. Weller Associates, Inc.,* 72 N.Y.2d 587, 535 N.Y.S.2d 356, 531 N.E.2d 1288 (1988) (legality of a contract wherein the building contractor agreed to provide the services of a licensed engineer to draw up the necessary plans).

Moreover, the record is devoid of any evidence of intent on the part of Zitz or Erickson that the work was intended to be a work of joint authorship. The purported assignment, although never introduced in evidence, was prepared after this litigation commenced in March 1997—long after their alleged co-authorship of the plans. In fact, Zitz's testimony repudiates any

intention of joint authorship, since he never considered Erickson to be anything other than a scribe for his ideas. Thus, as stated in *Childress, supra,* no thought of co-authorship existed on the part of the co-author. *Id.* at 509.

### b. *The Architectural Work—Photograph of Townhouse II Styrofoam Model*

 Zitz also obtained copyright registration for the unconstructed architectural work identified as Townhouse II. (Pl.Ex.1) He testified that the model depicted in the photograph for his registration for Townhouse II was created by his father. In the registration, Richard J. Zitz is stated as the sole author. *Id.* Zitz testified that his father created the models from Zitz's original drawings, the same ones used by SCD to create the architectural plans. (Tr. 54.) Moreover, Zitz testified that his father was not an employee of his company although he did assist his father financially. (Tr 56–57.) For the same reasons that the technical drawings rendered by SCD are not authored by Zitz, the defendants have rebutted the presumption of validity and I find that the Townhouse II styrofoam model depicted in the photograph was not authored by Zitz and the registration of the architectural work of Townhouse II is therefore invalid. The plaintiff knowingly and deliberately withheld accurate information from the Copyright Office and made deliberate misrepresentations as to plaintiff's authorship.

### c. *The Architectural Work—The Constructed Houses—Townhouse I*

 Zitz also obtained copyright registration for a constructed architectural work, the Summerfield Lane House, which Zitz built. *See* Pl.Ex. 4. The defendants claim that Zitz misrepresented information to the Copyright Office in his application because the photographs which comprise the deposit are of the inside of the Little Noyack Path house and the outside of the Summerfield Lane house. The application

states that the registration is solely for the house constructed at the Summerfield Lane house. The registration, dated February 3, 1995, states that construction was completed in 1991. *Id.*

Section 202.11 of the Code of Federal Regulations governs the registration of architectural plans and works, and provides, in pertinent part:

. . . (c) Registration—

(1) Original design. In general, an original design of a building embodied in any tangible medium of expression, including a building, architectural plans, or drawings, may be registered as an architectural work.

(2) Registration limited to single architectural work. For published and unpublished architectural works, a single application may cover only a single architectural work. A group of architectural works may not be registered on a single application form. For works such as tract housing, a single work is one house model, with all accompanying floor plan options, elevations, and styles that are applicable to that particular model.

(3) Application form. Registration should be sought on Form VA. Line one of the form should give the title of the building. The date of construction of the building, if any, should also be designated. If the building has not yet been constructed, the notation "not yet constructed" should be given following the title.

(4) Separate registration for plans. Where dual copyright claims exist in technical drawings and the architectural work depicted in the drawings, any claims with respect to the technical drawings and architectural work must be registered separately.

(5) Publication. Publication of an architectural work occurs when underlying plans or drawings of the building or other copies of the building design are distributed or made available to the gen-

eral public by sale or other transfer of ownership, or by rental, lease, or lending. Construction of a building does not itself constitute publication for purposes of registration, unless multiple copies are constructed.

(d) Works excluded. The following structures, features, or works cannot be registered:

(1) Structures other than buildings. Structures other than buildings, such as bridges, cloverleafs, dams, walkways, tents, recreational vehicles, mobile homes, and boats.

(2) Standard features. Standard configurations of spaces, and individual standard features, such as windows, doors, and other staple building components.

(3) Pre–December 1, 1990 building designs. The designs of buildings where the plans or drawings of the building were published before December 1, 1990, or the buildings were constructed or otherwise published before December 1, 1990.

37 C.F.R. § 202.11 (1998).

Zitz claims that the photographs of the Summerfield Lane and Little Noyack Path houses were included in his deposit to show different versions of the same model, namely, Townhouse I, and that the application was not for a copyright in one house. However, Zitz did not include "all accompanying floor plan options, elevations, and styles that are applicable to that particular model," as required under 37 C.F.R. § 202.11(c)(2). If these errors were merely inadvertent, however, the copyright remains valid unless defendants can prove Zitz intentionally misrepresented this information to the Copyright Office. *See Santrayall v. Burrell,* 993 F.Supp. 173, 176 (S.D.N.Y.1998) ("Under the doctrine of fraud on the Copyright Office, the presumption of validity may only be overcome by proof of deliberate misrepresentation.").

■ It is more reasonable to conclude that Zitz desired the exact opposite of what defendants contend. Copyright in different versions of Townhouse I would afford Zitz more protection than a copyright of only the Summerfield Lane house. There was no credible evidence submitted by either defendant that Zitz intended to mislead the Copyright Office by pretending that the submitted photographs were of a single work and therefore I conclude that this registration is for a model home, not an individual work. *See* 37 C.F.R. § 202.11(c)(2). (1998). However, because "[s]tandard configurations of spaces, and individual standard features, such as windows, doors, and other staple building components," are not copyrightable under 37 C.F.R. § 202.11(d)(2), only the outside appearance of the Townhouse I houses may be covered by this registration since the photographs of the inside of Townhouse I are of individual standard features, such as windows, doors and stairwells. This conclusion, however, does not end the Court's inquiry as to whether the registration for this architectural work—the model home of Townhouse I—is valid.

The Architectural Works Copyright Protection Act (the "AWCPA") became effective on December 1, 1990. 17 U.S.C. § 102. The AWCPA was enacted to bring the United States into compliance with the Berne Convention on the Protection of Literary and Artistic Works. Prior to the 1990 amendments, architectural structures were only protected insofar as they could "qualify as a work of art or conceivably as a reproduction of a work of art." *Fotomat Corp. v. Photo Drive–Thru, Inc.,* 425 F.Supp. 693, 707 (D.N.J.1977). Examples include the Statute of Liberty or the Eiffel Tower. The AWCPA protects only those "architectural works that, on December 1, 1990, remained 'unconstructed.'" Nimmer on Copyright § 2.20 (citing *Bryce & Palazzola Architects & Assocs., Inc. v. A.M.E. Group, Inc.,* 865 F.Supp. 401, 406 (E.D.Mich.1994)). Pursuant to Regulation § 202.11(d), buildings constructed or plans otherwise published before December 1, 1990 cannot be registered. However, nei-

ther the statute nor the regulations define "constructed" with respect to architectural works. Webster's Dictionary defines "construct" as "[t]o put together by assembling parts; ... [t]o create ... by systematically arranging ideas or expressions." Webster's II New Riverside Dictionary, at 301 (1994).

In *Bryce & Palazzola Architects & Associates, Inc. v. A.M.E. Group, Inc.*, 865 F.Supp. 401, 406 (E.D.Mich.1994), the District Court for the Eastern District of Michigan denied summary judgment on the issue of the validity of the copyright registration of an architectural work due to disputed facts as to construction prior to the effective date of the amendment. The defendants asserted that the building was constructed before December 1, 1990 "because construction was well underway by that date." *Bryce*, 865 F.Supp. at 406. The defendants supported their assertion by showing that the three permits relating to the construction of the building were all issued in October 1990. *Id.* Plaintiff argued that the building was not constructed until 1991, citing affidavits which claim that the rough framing of the house was constructed from February to March of 1991, the roof was installed from March to April of 1991 and the structure was bricked in May of 1991. *Id.* The court held that "a genuine issue of material fact exist[ed] regarding whether there had been sufficient work completed on the structure before December 1, 1990, to constitute 'construction.'" *Id.* Pursuant to *Bryce*, the plain meaning of the term "constructed" in the statute should not be interpreted as meaning "finished" or "completed" but rather "built" to the extent that it was no longer an idea or plan but a tangible structure.

■ The building permit for the Little Noyack Path house was issued on November 24, 1989. (Def.Ex.AA). The Certificate of Registration for the Townhouse I architectural plans state that the Little Noyack Path house was completed in September 1991 (Pl.Ex.3). Zitz received a permit in December 1989 and started construction on the Little Noyack Path house in 1990. Zitz testified that he worked on it continuously until it was completed in September 1991. The issue therefore is whether this architectural work is "unconstructed" as of December 1, 1990.

It is reasonable to infer from the evidence adduced that the first house was substantially under construction when the AWCPA took effect on December 1, 1990—a year after the building permit was issued by the Town. I therefore find that the first Townhouse I was not "unconstructed" as of December 1, 1990, and therefore is not entitled to copyright protection. Since Townhouse I is the work on which Pereira's second house is patterned, as depicted in the exterior view in the photographs, any infringement claim based on the registration of this architectural work (Townhouse I) cannot be maintained.

Based on the foregoing, it is not necessary to address other issues raised by the parties. The request by the defendant, Podlas, for attorney fees, under 17 U.S.C. § 505, is hereby denied.

### CONCLUSION

For the foregoing reasons, the Clerk is directed to enter judgment in favor of the defendants dismissing this action, without costs.

SO ORDERED: